## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

-----------------------------------------------------------

**NATIONAL LABOR RELATIONS BOARD**, :

Petitioner,

v.

**MASTEC ADVANCED TECHNOLOGIES**,
**A DIVISION OF MASTEC, INC.**

Respondent.

-----------------------------------------------------------

**Case No. 11-1274**

(Consolidated with
11-1273, 11-1294)

## NATIONAL LABOR RELATIONS BOARD'S
## PETITION FOR ADJUDICATION IN CIVIL CONTEMPT
## AND FOR OTHER CIVIL RELIEF

To the Honorable, the Judges of the United States Court
of Appeals for the District of Columbia Circuit:

The National Labor Relations Board ("the Board" or "NLRB"), an

administrative agency of the United States Government, respectfully petitions the

Court to adjudge MasTec Advanced Technologies, a Division of MasTec, Inc.

("MasTec"), in civil contempt.

MasTec has violated and failed to comply with a judgment entered by this

Court on September 16, 2016 (the "Judgment") by failing to timely: (1) offer full

reinstatement to employees Hugh Fowler, Joseph Guest, and Delroy Harrison; (2)

remove from its files all references to MasTec's unlawful discharge of 26 named

employees (collectively, the "Discriminatees") and notify the Discriminatees that

1

this had been done; (3) preserve and provide the Board with requested records needed to needed to analyze the amount of back pay MasTec owes the Discriminatees; (4) rescind unlawful rules from MasTec's employee handbook and notify its employees of the rescission; (5) physically post and electronically distribute signed notices prepared by the Board; and (6) file with the Board a sworn certification attesting to MasTec's compliance efforts.

These obligations were all ordered to have been met within weeks of entry of the Judgment in September 2016, yet MasTec failed to timely comply. Only in March 2019, facing potential contempt sanctions for failing to obey an order compelling compliance with a subpoena—issued by the Board to investigate the extent, if any, of MasTec's compliance with the Judgment—did MasTec partially comply. Even so, MasTec has yet to comply with all of its obligations under the Judgment.

In support of its Petition, the Board, upon information and belief, alleges as follows:

## PROCEDURAL HISTORY

### The Board's Order

1. MasTec is a Florida corporation that provides television satellite installation and maintenance services for DirecTV, Inc. ("DirecTV") from several

(Page 2 of Total)

facilities in Florida and other states, including a facility in the Orlando, Florida area.

2. On July 21, 2011, the Board issued a Decision and Order ("Board Order") in NLRB Case Nos. 12-CA-024979 and 12-CA-025055, finding that MasTec committed numerous violations of Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 151, et seq., ("the Act") by, *inter alia*, maintaining unlawful work rules nationwide and discharging 26 employees at its Orlando, Florida facility for publicly airing their workplace grievances. [See Attachment A.]

## The Court's September 16, 2016 Judgment

3. On September 16, 2016, this Court entered its Judgment enforcing the Board Order in full. [See Attachment B.]

4. The Board Order, as enforced by the Judgment, in pertinent part, directs that MasTec and its "officers, agents, successors, and assigns" shall:

\* \* \*

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Within 14 days from the date of this Order, offer Jouvani Alicea, Marlon Binet, Christopher Creary, Leroy Davis, Donovan Edwards, Sebastian Eriste, Hugh Fowler, Joseph Guest, Delroy Harrison, James Hehmann, Mark Hemann, Michael Hermitt, Federico Hoy, Fernando Hoy, Ariel Kelly, Shervoy Lopez, Ricardo Perlaza, Sergio Pitta, Noel Rodriguez, Rudy Rodriguez, Fernando Sando, Olmy Talent, Diego Velez, Nerio Vera, Ralph Wilson, and Carlos Zambrano full reinstatement to their former jobs, or if those jobs no longer exist, to substantially equivalent

3

positions, without prejudice to their . . . rights or privileges previously enjoyed.

\* \* \*

(c) Within 14 days from the date of this Order, remove from its files any reference to the unlawful discharges, and within 3 days thereafter, notify the employees in writing that this has been done and that the discharges will not be used against them in any way.

(d) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide . . . all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of back pay due under the terms of this Order.

\* \* \*

(f) Notify all employees who received the employee handbook that [the confidentiality policy and the solicitation and distribution rules that existed in March 2006] have been rescinded and will no longer be enforced.

(g) Within 14 days after service by the Region, post at its facility in Orlando, Florida, copies of the attached notices marked "Appendix A" and "Appendix C" and within that same time period post at all its other facilities, nationwide, copies of the attached notice marked "Appendix B."[] Copies of the notices, on forms provided by the Regional Director for Region 12, after being signed by the Respondents' authorized representatives, shall be posted by Respondent MasTec and maintained for 60 consecutive days. . . . In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email. . . and/or other electronic means, if the Respondent customarily communicates with its employees by such means . . . .

(h) Within 21 days after the service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the

4

Respondent has taken to comply.

5. At all times relevant, MasTec has had notice and knowledge of the Board Order and this Court's Judgment enforcing the Order.

## District Court Subpoena Enforcement Proceedings

6. On February 21, 2018, in furtherance of an investigation into the extent, if any, of MasTec's compliance with the Judgment, the Board issued an administrative subpoena *duces tecum* requiring MasTec to produce, by March 7, 2018, documentation indicating MasTec's compliance with Paragraphs 2(a), (c), (d), (e), (f), (g), and (h) of the enforced Board Order.

7. On May 17, 2018, the Board, based on MasTec's failure to fully provide the subpoenaed information, applied to the U.S. District Court for the Middle District of Florida ("Middle District of Florida") in Case Number 6:18-mc-33 for enforcement of the subpoena referenced in Paragraph 6.

8. On August 10, 2018, the Middle District of Florida issued its order in Case Number 6:18-mc-33, requiring MasTec to fully comply with the subpoena by September 24, 2018.

9. On November 9, 2018, the Board, upon motion, initiated civil contempt proceedings in the Middle District of Florida in Case Number 6:18-mc-33, alleging that MasTec failed to comply with the order referenced in Paragraph 8.

10. On March 8, 2019, 17 days after the conclusion of the evidentiary hearing in Case Number 6:18-mc-33, MasTec produced numerous records that were responsive to the Board's subpoena.

11. Among the records MasTec produced for the first time on March 8, 2019 were: documents allegedly demonstrating that reinstatement offers had been issued to Discriminatees, as well as newly-issued reinstatement offers sent to discriminatees Hugh Fowler, Joseph Guest, and Delroy Harrison on March 1, 2019;[1] the requested payroll records; a certification that notices had been posted and electronically distributed in March 2019; and a certification of compliance with the Board Order dated March 7, 2019.

## THE EMPLOYER'S CONTUMACIOUS CONDUCT

12. By the conduct described below in Paragraphs 13 through 82, MasTec has repeatedly violated and disobeyed the Judgment issued by this Court on September 16, 2016, and accordingly is in civil contempt of this Court.

---

[1] MasTec allegedly sent reinstatement offers to 23 of the 26 Discriminatees between 2013 and 2014, reissuing offers to some of those Discriminatees in 2014 and 2019. Whether any of the reinstatement offers that MasTec sent to Discriminatees are legally valid – including the offers sent to Hugh Fowler, Joseph Guest, and Delroy Harrison for the first time in March 2019 – will be determined through a separate administrative proceeding in connection with the determination of the amount of back pay owed to the Discriminatees to make them whole for MasTec's unfair labor practices.

6

## Failure to Timely Offer Reinstatement to Employees

13. MasTec has violated the Judgment by failing and refusing to timely comply with the reinstatement provisions of Paragraph 2(a) of the enforced Board Order, as shown in Paragraphs 14 through 19 below.

14. MasTec failed to make an offer of reinstatement to Hugh Fowler within 14 days of entry of the Judgment.

15. MasTec failed to make any offer of reinstatement to Hugh Fowler until March 1, 2019.

16. MasTec failed to make an offer of reinstatement to Joseph Guest within 14 days of entry of the Judgment.

17. MasTec failed to make any offer of reinstatement to Joseph Guest until March 1, 2019.

18. MasTec failed to make an offer of reinstatement to Delroy Harrison within 14 days of entry of the Judgment.

19. MasTec failed to make any offer reinstatement to Delroy Harrison until March 1, 2019.

## Failure to Timely Expunge Discipline Records and to Timely Notify Employees in Writing of Such Expungement

20. MasTec has violated the Judgment by failing and refusing to timely comply with the expunction and notice provisions of Paragraph 2(c) of the enforced Board Order, as shown in Paragraphs 21 through 24 below:

7

21. MasTec failed to remove from its records all references to the unlawful discharges of the Discriminatees within 14 days of entry of the Judgment.

22. MasTec failed, until at least May 1, 2018, to remove from its records all references to the unlawful discharges of the Discriminatees named in the enforced Board Order.

23. MasTec failed to notify the Discriminatees, within 3 days, of the removal described in Paragraph 22 and that their discharges would not be used against them in any way.

24. On or about March 1, 2019, MasTec notified the Discriminatees for the first time, in writing, that all references to their unlawful discharges had been removed from MasTec's records and would not be used against them in any way.

## Failure to Timely Notify Employees Regarding Rescission of Unlawful Rules and Policies

25. MasTec has violated the Judgment by failing and refusing to comply with the rescission provisions of Paragraph 2(f) of the enforced Board Order by failing and refusing, until March 1, 2019, to notify the affected employees that certain unlawful rules and policies have been rescinded and would not be enforced.

## Failure to Timely Produce Reinstatement Records Requested by the Board

26. As shown in Paragraphs 27 through 36 below, MasTec has violated the Judgment by failing and refusing to timely comply with provisions of Paragraph 2(d) of the enforced Board Order as it pertains to the preservation and production

8

of reinstatement records requested by the Board so that it can analyze the amount of backpay due under the Judgment.

27. The Board needs copies of reinstatement offers MasTec sent to Discriminatees and proof of their issuance to the Discriminatees (i.e., the date(s) and method(s) of their issuance) in order to analyze and to calculate the amount of backpay owed to employees under the Judgment.

28. On October 27, 2016, the Board requested in writing that, among other things, MasTec produce to the Board by November 17, 2016, copies of reinstatement offers sent to the Discriminatees.

29. MasTec failed to provide copies of any reinstatement offers in response to the Board's request referenced in Paragraph 28.

30. On March 2, 2017, the Board again requested in writing that, among other things, MasTec produce to the Board by March 23, 2017, copies of reinstatement offers sent to the Discriminatees.

31. MasTec failed to provide copies of any reinstatement offers in response to the Board's request referenced in Paragraph 30.

32. On January 19, 2018, the Board requested in writing that, among other things, MasTec produce to the Board by February 19, 2018, copies of all reinstatement offers sent to the Discriminatees, along with proof of their issuance to the Discriminatees.

33. MasTec failed to provide copies of any reinstatement offers or proof of their issuance in response to the Board's request referenced in Paragraph 32.

34. On February 21, 2018, the Board issued the administrative subpoena *duces tecum* described above in Paragraph 6, requiring MasTec to produce by March 7, 2018, copies of, among other items, all reinstatement offers and proof of their issuance.

35. On March 7, 2018, MasTec provided to the Board copies of reinstatement offers allegedly sent to 16 of the 26 Discriminatees, but failed to provide proof of the offers' issuance.

36. On March 8, 2019, 17 days after conclusion of the evidentiary hearing in the subpoena enforcement proceeding described above in Paragraphs 6 through 11, MasTec produced copies of the remaining reinstatement offers and proof of their issuance as requested by the Board's subpoena.

### **Failure to Timely Produce Payroll Records Requested by the Board**

37. As set forth in Paragraphs 38 through 45 below, MasTec failed and refused to timely comply with Paragraph 2(d) of the enforced Board Order as it pertains to the preservation and production of payroll records requested by the Board so that it can analyze the amount of backpay due under the Judgment.

38. On April 5, 2017, the Board requested in writing that MasTec produce to the Board, by April 19, 2017, copies of certain payroll records, including pay

statements issued to Discriminatees and to other comparable employees dating back to May 4, 2006.

39. The Board needs the requested payroll records in order to analyze and to calculate the amount of backpay owed to employees under the Judgment.

40. MasTec failed to provide the Board with copies of any payroll records in response to the Board's request referenced in Paragraph 38.

41. On January 19, 2018, requested in writing that MasTec produce to the Board by February 19, 2018, among other things, copies of the payroll records requested on April 5, 2017.

42. MasTec failed to provide the Board with copies of any payroll records in response to the Board's request referenced in Paragraph 41.

43. On February 21, 2018, the Board issued the subpoena referenced in Paragraph 6, which sought, among other items, the payroll records described in Paragraph 38.

44. On September 4, 2018, MasTec provided some, but not all, of the payroll records requested by the Board's subpoena.

45. On March 8, 2019, 17 days after the evidentiary hearing in the subpoena enforcement proceeding described above in Paragraphs 6 through 11, MasTec produced the remaining payroll records requested by the Board's subpoena.

11

## Failure to Produce Additional Records Requested by the
## Board to Analyze the Amount of Backpay Due Under the Judgment

46. As shown below in Paragraphs 47 through 53, since the close of the subpoena enforcement proceeding described in Paragraphs 6 through 11 above, MasTec continues to fail and refuse to timely comply with Paragraph 2(d) of the enforced Board Order as it pertains to the production of additional records requested by the Board so that it can analyze the amount of backpay due under the Judgment. .

47. On July 11, 2019, the Board wrote to MasTec requesting, among other things, records relating to offers of reinstatement that may have been issued after the close of the subpoena enforcement proceeding, and records relating to the employment of individuals with criminal backgrounds.

48. On July 29, 2019, the Board wrote to MasTec requesting records relating to discounted TV service offered as a benefit to Discriminatees.

49. On September 3, 2019, the Board requested records regarding MasTec's 401(k) contributions.

50. The Board needs the records it requested on July 11, July 29, and September 3, 2019, and described in Paragraphs 47 through 49 above, in order to analyze the amount of backpay due under the Judgment.

(Page 12 of Total)

51. On October 11, 2019, the Board wrote to MasTec reiterating its request for outstanding records described in Paragraphs 47 through 49 that were originally requested on July 11, 2019, July 29, 2019 and September 3, 2019.

52. To date, MasTec has yet to reply to the Board in response to its October 11, 2019 communication, as described in Paragraph 51.

53. To date, MasTec has yet to provide all of the records originally requested by the Board on July 11, 2019, July 29, 2019, and September 3, 2019, as described in Paragraphs 47 through 49.

**<u>Failure to Timely Post and Electronically Distribute Notices to Employees</u>**

54. MasTec has violated the Judgment by failing and refusing to timely comply with Paragraph 2(g) of the enforced Board Order with respect to the posting and electronic distribution of three separate employee notices, as shown in Paragraphs 55 through 76 below.

55. Since at least September 16, 2016, MasTec has customarily communicated with its employees electronically, including by email.

### *Notice A*

56. As shown in Paragraphs 57 through 62 below, MasTec failed and refused to physically post and electronically distribute copies of the Notice to Employees marked Appendix A in the enforced Board Order ("Notice A") within 14 days after copies of the notice were served on MasTec by the Board.

57. On October 27, 2016, the Board sent MasTec copies of Notice A along with a posting certification form to be completed by MasTec and returned to the Board by November 17, 2016.

58. On March 2, 2017, the Board again sent MasTec copies of Notice A along with a posting certification form to be completed by MasTec and returned to the Board by March 23, 2017.

59. On February 21, 2018, the Board again sent MasTec copies of Notice A along with a posting certification form to be completed by MasTec and returned to the Board.

60. MasTec failed to physically post Notice A at its Orlando Florida facility until on or about March 1, 2019.

61. MasTec failed to electronically distribute Notice A to its employees until on or about March 1, 2019.

62. On or about March 8, 2019, MasTec returned, for the first time, a completed posting certification form pertaining to Notice A.

### *Notice B*

63. As shown below in Paragraphs 64 through 69 below, MasTec failed and refused to physically post and electronically distribute copies of the Notice to Employees marked Appendix B in the enforced Board Order ("Notice B"), within 14 days after copies of the notice were served on MasTec by the Board.

14

64. On October 27, 2016, the Board sent MasTec copies of Notice B along with a posting certification form to be completed by MasTec and returned to the Board by November 17, 2016.

65. On March 2, 2017, the Board again sent MasTec copies of Notice B along with a posting certification form to be completed by MasTec and returned to the Board by March 23, 2017.

66. On February 21, 2018, the Board again sent MasTec copies of Notice B along with a posting certification form to be completed by MasTec and returned to the Board.

67. MasTec failed to physically post Notice B at its facilities nationwide until on or about between March 1, 2019 and March 4, 2019.

68. MasTec failed to electronically distribute Notice B to its employees until on or about March 1, 2019.

69. On or about March 8, 2019, MasTec returned to the Board, for the first time, a completed a posting certification form pertaining to Notice B.

### Notice C

70. As shown in Paragraphs 71 through 76 below, MasTec continues to fail and refuse to physically post and electronically distribute copies of the Notice to Employees that is marked Appendix C in the enforced Board Order ("Notice C") and bears the signature of a representative of DirecTV.

71. On or about March 31, 2017, MasTec received 15 copies of Notice C bearing the signature of a representative of DirecTV.

72. On February 21, 2018, the Board sent MasTec copies of Notice C bearing the signature of a representative of DirecTV, along with a posting certification form to be completed by MasTec and returned to the Board.

73. To date, MasTec has failed to physically post at its Orlando, Florida facility and electronically distribute to its employees copies of Notice C bearing the signature of a representative of DirecTV.

74. On March 1, 2019, MasTec physically posted at its Orlando, Florida facility, for the first time, a version of Notice C that was not signed by a representative of DirecTV.

75. On March 1, 2019, MasTec electronically distributed to its employees, for the first time, a version of the Notice C that was not signed by a representative of DirecTV.

76. To date, MasTec has not returned to the Board a completed posting certification form correctly pertaining to copies of Notice C bearing the signature of a representative of DirecTV.

16

## Failure to Timely Complete and Return a Certification of Compliance Form

77. As shown in Paragraphs 78 through 82 below, MasTec has violated the Judgment by failing to comply with the compliance certification provisions of Paragraph 2(h) of the enforced Board Order.

78. On October 27, 2016, the Board sent MasTec a compliance certification form, to be completed by MasTec and returned to the Board by November 17, 2016, certifying the steps taken to comply with the enforced Board Order.

79. On March 2, 2017, the Board sent MasTec a compliance certification form, to be completed by MasTec and returned to the Board by March 23, 2017.

80. On February 21, 2018, the Board sent MasTec a compliance certification form, to be completed by MasTec and returned to the Board.

81. MasTec failed to return to the Board any completed compliance certification form within 21 days of its service on MasTec as described in Paragraphs 78, 79, and 80, above.

82. On or about March 8, 2019, MasTec returned to the Board, for the first time, a completed compliance certification form.

## PRAYER FOR RELIEF

**WHEREFORE**, the Board respectfully requests as follows:

A. That this Court enter an order requiring MasTec to serve and file its sworn answer to the allegations of this petition in which MasTec shall admit or

deny or meet by affirmative defense each allegation of said petition, and show

cause, if any there be, why it should not be adjudged in civil contempt for

disobeying and failing and refusing to comply with the Judgment issued by this

Court on September 16, 2016.

B. That following appropriate proceedings, the Court issue a contempt

adjudication finding MasTec to be in civil contempt of this Court's Judgment

entered on September 16, 2016.

C. That upon such adjudication, the Court enter an order requiring

MasTec and its officers, agents, successors, and assigns, to purge themselves of

such contempt by, to the extent they have not already done so, fully complying

with and obeying the September 16, 2016 Judgment of this Court, and not in any

way, by action or inaction, engaging in, inducing, or encouraging any violation of

that Judgment.

D. That upon such adjudication, the Court further order that MasTec take

the following affirmative actions to purge itself of contempt:

(1) Within 14 days of entry of the Court's contempt adjudication,

provide the Board with all outstanding records it requested on July 11, 2019, July

29, 2019, and September 3, 2019.

(2) Within 14 days of entry of the Court's contempt adjudication, post

at its Orlando, Florida facility, where notices to its employees are customarily

(Page 18 of Total)

posted, for a period of 60 consecutive days, copies of the Notice to Employees signed by a representative of DirecTV, which the Board previously served on MasTec on or about March 31, 2017, and on February 21, 2018 (see Paragraphs 71 and 72). In addition to physical posting of the paper notices, MasTec shall, within 21 days of entry of the contempt adjudication, transmit, by email or certified mail, at its own expense, a copy of the notice to each current and former employee of MasTec who has worked for MasTec at its Orlando, Florida facility for any period of time since September 16, 2016. MasTec shall maintain the posted notices in clearly legible condition throughout the posting period and insure that they are not altered, defaced, or covered by other material. Within 21 days of entry of the contempt adjudication, MasTec shall supply to the Board's Region 12 office ("Region 12") in Tampa, Florida, with a copy to the Board's Contempt, Compliance and Special Litigation Branch ("CCSLB") in Washington, District of Columbia, a signed and sworn certification from a responsible MasTec official attesting to the following: the posting dates and locations; the name of each employee to whom the notice was transmitted by email or by certified mail; and, for each such employee, the method by which the notice was transmitted and the date of transmission. This certification shall be accompanied by documents evidencing transmission of the notice to each employee, such as copies of emails and/or certified return receipts.

19

(3) Within 14 days after service by the Board of a new Notice to Employees, duplicate at its own expense and post at all of its facilities nationwide where notices to its employees are customarily posted, for a period of 90 consecutive days, copies of the contempt adjudication and the new Notice to Employees in the form prescribed by the Board and signed by a responsible officer on behalf of MasTec. This notice shall state that MasTec has been adjudged in civil contempt of this Court for violating and disobeying the Court's Judgment, and that it will undertake the actions in purgation directed by this Court as described in the notice. In addition to physical posting of the paper notices, MasTec shall, within 21 days after service by the Board, transmit the notice electronically to all current employees at its facilities nationwide, by e-mail, text message, and/or other electronic means. MasTec shall maintain the posted notices and posted copies of the contempt adjudication in clearly legible condition throughout the posting period and insure that they are not altered, defaced, or covered by other material. Within 28 days after service by the Board of this notice, MasTec shall supply to Region 12, with a copy to CCSLB, a signed copy of the notice and a signed and sworn certification by a responsible MasTec official attesting to the following: the posting dates and locations; the name of each employee to whom the notice was transmitted by email or by certified mail; and, for each such employee, the method by which the notice was transmitted and the date of transmission. This certification

20

shall be accompanied by documents evidencing transmission of the notice to each
employee, such as copies of email and/or certified mail receipts.

(4) During regular business hours, permit an agent of Board access to
the premises of MasTec facilities during the posting period to verify MasTec's
compliance with the provisions discussed in Paragraph (D)(2), and (3) above;

(5) Within 14 days of service of the Notice to Employees referenced in
Paragraph (D)(3), distribute copies of the notice and the contempt adjudication to
current officers, managers, and supervisors of MasTec at all of its facilities
nationwide. Each such officer, manager, and supervisor shall acknowledge in
writing, with his or her signature, printed name, and date of signature, that he or
she has received a copy of the notice and the contempt adjudication. Within 21
days of service of the Notice to Employees referenced in Paragraph (D)(3),
MasTec shall provide to Region 12, with a copy to CCSLB, copies of all signed
and dated acknowledgments;

(6) File a sworn statement with the Clerk of this Court, and copies
thereof to Region 12 office and to CCSLB, within 35 days after the contempt
adjudication and again upon termination of the posting period, showing what steps
have been taken to comply with the Court's directives; and

(7) Pay to the Board all costs and expenses, including reasonable
attorneys' fees calculated at the prevailing market rate in Washington, D.C.,

incurred by the Board in the investigation, preparation, presentation, and final

disposition of this proceeding, including any costs relative to a special master

should the Court appoint one; said amount, unless agreed to by the parties, to be

fixed by further order of the Court upon submission by the Board of a certified

statement of such costs and expenses. Should any dispute arise respecting the

Board's submission as to which the Court may determine that a hearing is

desirable, the Court, in its discretion, may refer such dispute to a special master,

upon such terms as the Court shall determine, for a report and recommendation.

     E.  That, in order to assure against violations of the contempt

adjudication, the Court enter an order imposing against MasTec a prospective fine

of $100,000.00 for each future violation of the Judgment and/or the contempt

adjudication, and a further fine of up to $2,500.00 per day for each day the Court

finds the violation(s) have continued. The order shall also impose a separate

prospective fine of $1,000.00 for each and every future violation, and a further

$100.00 per day for each day the Court finds the violation(s) to have continued,

against each of MasTec's officers, agents, and representatives who act in concert

with MasTec and with notice and knowledge of the Court's September 16, 2016

Judgment or this contempt adjudication.

F.  That the Court take such other and further actions and grant such other

relief as may be just, reasonable, and proper to assure compliance with the Court's

Judgment, and as this proceeding in civil contempt may require.


Respectfully submitted,

**NATIONAL LABOR RELATIONS BOARD**

/s/ Daniel Brasil Becker
Daniel Brasil Becker
Trial Attorney
Tel: (202) 208-2255
Fax: (202 273-4244
Daniel.Becker@nlrb.gov

David H. Mori
Supervisory Attorney
David.Mori@nlrb.gov
Tel: (202)273-3743

William G. Mascioli
Assistant General Counsel
Bill.Mascioli@nlrb.gov
Tel: (202) 273-3746

Contempt, Compliance, & Special Litigation Branch
1015 Half Street, S.E., Fourth Floor
Washington, D.C.  20003


Dated at Washington, D.C.,
this 19th day of November, 2019.

(Page 23 of Total)

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 19, 2019, I filed the foregoing Petition for

Adjudication in Civil Contempt and for Other Civil Relief using the Court's

CM/ECF filing system, thereby providing service to Gavin S. Appleby, counsel for

Respondent, MasTec Advanced Technologies, a Division of MasTec, Inc.

> /s/ Daniel Brasil Becker
> Daniel Brasil Becker
> Trial Attorney
> National Labor Relations Board
> Tel: (202) 208-2255
> Daniel.Becker@nlrb.gov

Dated at Washington, D.C.,
this 19th day of November, 2019.

24

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the word volume limit of Fed. R. App. P. 32(g)(1) because, excluding parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,750 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.


/s/ Daniel Brasil Becker
Daniel Brasil Becker
Trial Attorney
National Labor Relations Board
Tel: (202) 208-2255
Daniel.Becker@nlrb.gov


Dated at Washington, D.C.,
this 19th day of November, 2019.

25

Case 1:20-mc-00022-GMH   Document 2   Filed 04/10/20   Page 26 of 49
USCA Case #11-1274      Document #1816471         Filed: 11/19/2019      Page 1 of 23

103

MASTEC ADVANCED TECHNOLOGIES

**MasTec Advanced Technologies, a Division of Mas-Tec, Inc. *and* Joseph Guest**

**DirecTV, Inc. *and* Joseph Guest.**   Cases 12–CA–024979 and 12–CA–025055

July 21, 2011

DECISION AND ORDER

BY CHAIRMAN LIEBMAN AND MEMBERS BECKER AND HAYES

This case presents the question of whether 26 former service technicians employed by Respondent Advanced Technologies, a Division of MasTec, Inc. (MasTec), lost the protection of the Act by appearing on a television news broadcast in which statements were made about their employer and Respondent DirecTV, Inc., for which MasTec provides installation services.[1]  The technicians' participation in the newscast grew out of their opposition to a new compensation formula that MasTec implemented in response to DirecTV's dissatisfaction with MasTec's performance.[2]

Applying the principles set forth by the Supreme Court in *Jefferson Standard*,[3] regarding the extent to which employees' disparaging statements to third parties about their employer's product or service enjoy the Act's protection, the judge concluded that the technicians' statements were unprotected and thus that neither MasTec, by terminating its employees, nor DirecTV, by causing their termination, violated Section 8(a)(1).

In his exceptions, the General Counsel challenges the judge's finding that the employees' statements were unprotected. As explained below, we find merit in the General Counsel's position.

Factual Background

MasTec operates as a home service provider (HSP), installing and maintaining satellite television equipment under contract with satellite television providers.  In the Orlando, Florida area MasTec's only client is DirecTV.  The HSP contract agreement requires DirecTV to pay MasTec a fee for every installation, and allows for penalties to be imposed if MasTec fails to meet performance standards.

The Respondents consider connecting the satellite receiver to an active telephone land line to be part of a standard installation.  Such connections allow customers (1) to order pay-per-view by using the remote control; (2) to have caller ID information displayed on their television screen; and (3) to receive downloads of DirecTV software upgrades.  In addition, phone line connections provide a record of what customers are viewing, thereby assisting DirecTV in making programming decisions.

Although these features may be attractive to many consumers, and have potential benefits for DirecTV's business, telephone line connections are not essential for the system to function.  The record establishes that a satellite receiver will properly transmit the signal to a television set without a telephone connection.  Many customers resist having the telephone connection made, even though there is no extra charge for a standard connection.[4]  Receivers that are connected to phone lines are referred to as "responders" because they respond to a verification signal; unconnected receivers are called "non-responders."

Because of the business importance of telephone connections, the Respondents have emphasized to technicians the need to make as many connections as possible.  Despite the Respondents' efforts, however, it is undisputed that connections were often not made.  In early 2006,[5] therefore, DirecTV informed MasTec that if it did

---

[1] On January 4, 2008, Administrative Law Judge Michael A. Marcionese issued the attached decision.  The General Counsel filed exceptions and a supporting brief, the Respondents MasTec, Inc. and DirecTV, Inc. filed answering briefs, and the General Counsel filed a reply brief.

The National Labor Relations Board has considered the judge's decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings, and conclusions only to the extent consistent with this Decision and Order.

[2] No exceptions were filed to the judge's dismissal of the 8(a)(1) complaint allegation that Respondent MasTec's Operations Manager, Chris Brown, threatened to discharge employees if they complained about their wages.

Respondent MasTec asserts in its answering brief that the judge erred by granting WKMG-TV-6's petition to revoke MasTec's subpoena, which sought information concerning the preparation of the news broadcast on which MasTec's technicians appeared.  No party raised this issue through exceptions or cross-exceptions, and therefore it has been waived.  See Sec. 102.46(b)(2) and (g) of the Board's Rules and Regulations.  We shall therefore grant the General Counsel's request to strike that portion of MasTec's brief.

Respondent MasTec does not except to the judge's finding that Supervisor Muniz violated Sec. 8(a)(1) by threatening employee Perlaza that the company would close because employees publicly complained about their wages.  Respondent MasTec also does not except to the judge's finding that the rules set forth in its March 2006 employee handbook pertaining to confidentiality, solicitation, and distribution violated Sec. 8(a)(1).  As discussed in the remedy section of this decision, because these unlawful handbook rules were maintained at all of MasTec's facilities, nationwide, we shall revise the recommended Order to require notice posting by MasTec at all of its facilities.

[3] *NLRB v. Electrical Workers Local 1229 (Jefferson Standard)*, 346 U.S. 464 (1953).

[4] If a customer wants a connection but does not wish to have the connecting wires exposed, the wires may be hidden through a custom installation at an additional charge.  A custom installation may be accomplished either by threading the wires inside a wall (a "wall fish") at a charge of $52.50, or by using a wireless telephone jack, priced at $49.

[5] Dates refer to 2006.

357 NLRB No. 17

104                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

not improve its responder installation rates, it would be penalized. Specifically, if technicians did not connect at least 50 percent of newly installed receivers to phone lines during the course of a month, DirecTV was going to charge MasTec $5 for each non-responder.

By memo of January 17, MasTec, in turn, informed technicians that their piece work pay structure would be modified to reflect the increased emphasis on improving responder installation rates. Beginning February 1, technicians would be paid $2 less for basic and additional outlet installations, but would earn $3.35 for each receiver they connected to a phone line. In addition, technicians would incur a backcharge of $5 for every new non-responding receiver installed during a 30-day period if they failed to connect at least 50 percent to phone lines. Technicians failing to meet the 50-percent threshold for 60 consecutive days would be subject to termination.

Technicians voiced strong opposition to the new pay formula at several team meetings, arguing that reaching the 50-percent responder rate threshold would be problematic. They pointed out that making the phone connection was not always possible, because of customer resistance or other circumstances beyond their control. Among the obstacles they encountered were: (1) customer concerns about children ordering pay-per-view from the remote; (2) customers wanting neither exposed wires nor to pay for custom installation to hide wires; (3) privacy concerns; and (4) the absence of a land line phone on the premises. Technicians also pointed out that even if they connected the receiver to a phone line during installation, customers could themselves later simply unplug it, leading to the same "non-responder" result.

In response to the technicians' arguments, MasTec supervisors suggested ways around these problems, including making the connection without telling customers they were doing so or telling customers, falsely, that the receiver would not work without it. At one meeting, after hearing a group of technicians repeating the arguments about why the new target percentage rate was unattainable, Regional Operations Manager Chris Brown told them to tell customers anything, "whatever you have to tell them" and "whatever it takes" to make the connection, even jokingly suggesting that technicians tell customers that the receiver would "blow up" if it was not connected.[6]

In addition, MasTec showed the technicians a DirecTV-produced video addressing the importance of making the receiver-phone line connection. In the video,

DirecTV's vice president for field operations, Stephen Crawford, said MasTec was not to blame for the increased emphasis on improving responder rates and that the pressure was coming instead from DirecTV. He and another DirecTV vice president, Scott Brown, suggested that technicians might have greater success in connecting receivers to phone lines if they did not tell customers they were doing so or simply told them—again, falsely—that the connection was "mandatory" and necessary "for the equipment to function correctly." They also suggested that the technicians tell customers, "I can either run the phone line for you or you can purchase a wireless phone jack from me," thereby "put[ting] it right back on the customer."[7]

Technicians received their first paychecks under the new compensation system in late March. Many had been backcharged for failing to reach the target responder installation rate. A number of technicians assembled at the Orlando facility parking lot on the mornings of March 27 and 28 and expressed their dissatisfaction to Brown and Facility Supervisor Herbert Villa, reiterating many of the same complaints they had raised with them in previous meetings. Despite their protestations, they were unable to persuade MasTec to rescind the new policy.

Frustrated by their failed efforts, a group of technicians decided that management might reconsider its adherence to the pay system if they took their complaints public. Technician Frank Martinez contacted a local television reporter, Nancy Alvarez from WKMG-TV Channel 6, and set up a meeting. On the morning of March 30, Martinez and 27 fellow technicians, dressed in their work uniforms, drove from the MasTec facility to Channel 6 in their company vans.[8] Alvarez met the technicians in the station's parking lot and invited them into Channel 6's studio where she interviewed them on film as a group. What occurred during this taped interview session, described below, was the basis for their discharge.

                              The Broadcast

On Friday, April 28, Channel 6 aired a "teaser" promoting the story. It began with a reporter asking, "Why did over 30 employees of a major company show up at [Channel] 6?" A video of this exchange followed:

---

[6] The judge credited Brown's testimony that he intended the "blow up" statement to be a joke and found that most of the technicians understood that Brown was not serious.

[7] MasTec also introduced into evidence a DirecTV installation checklist that technicians were instructed to follow and a copy of which was to be provided to every customer. Among the listed items that customers were to acknowledge were that the technician "Explained the importance of the telephone hook-up" and "Explained that I must maintain a working telephone line connected to all my DIRECTV System receivers." The second statement would predictably mislead customers to believe that the connection is required for the receiver to function.

[8] Although employed by MasTec, the technicians wear uniforms and drive vehicles bearing the DirecTV logo.

Case 1:20-mc-00022-GMH   Document 2   Filed 04/10/20   Page 28 of 49
USCA Case #11-1274     Document #1816471       Filed: 11/19/2019     Page 3 of 23

105

MASTEC ADVANCED TECHNOLOGIES

INTERVIEWER: "So you've basically been told to lie to customers?"

TECHNICIAN: "Yeah."

A voiceover by a reporter says, "to tell the Problem Solvers about a dirty little secret." This is followed by a video of a technician saying, "Tell the customer whatever you have to tell them." The teaser ends with a reporter saying, "that may be costing you money."

After seeing the teaser, MasTec's Chris Brown alerted its vice president for DirecTV business, Mark Retherford, and regional vice president, Gus Rey, who instructed Brown to record it and any broadcasts about the Respondents.

The full news story first aired during Channel 6's 5 p.m. newscast on Monday, May 1. The story begins with the following exchange among the anchors and reporter:

NEWS ANCHOR 1: Only on 6 . . . a problem solver investigation with a bit of a twist . . . this time they came to us.

NEWS ANCHOR 2: Yeah . . . technicians who have installed hundreds of DirecTV satellite systems across Central Florida . . . they're talking about a company policy that charges you for something you may not ever use. And as problem solver Nancy Alvarez found, if you don't pay for it, the workers do.

REPORTER ALVAREZ: They arrived at our Local 6 studios in droves. DirecTV trucks packed the parking lot and inside the technicians spoke their minds. (accompanying video showed more than 16 DirecTV vans in the parking lot followed by a shot panning a group of technicians wearing shirts bearing the DirecTV logo).

The scene shifts to a room where more than 20 technicians were seated, facing Alvarez.

TECHNICIAN LEE SELBY: We're just asking to be treated fairly.

ALVAREZ: These men have installed hundreds of DirecTV systems in homes across Central Florida but now they admit they've lied to customers along the way.

TECHNICIAN HUGH FOWLER: If we don't lie to the customers, we get back charged for it. And you can't make money.

ALVAREZ: We'll explain the lies later but first the truth. Phone lines are not necessary for a DirecTV system; having them only enhances the service allowing customers to order movies through a remote control instead of through the phone or over the internet.

ALVAREZ: So it's a convenience. . . .

TECHNICIAN FRANK MARTINEZ: It's more of a convenience than anything else. . . .

ALVAREZ: But every phone line connected to a receiver means more money for DirecTV and Mas-Tec, the contractor these men work for. So the techs say their supervisors have been putting pressure on them. Deducting five bucks from their paychecks for every DirecTV receiver that's not connected to a phone line.

MARTINEZ: We go to a home that . . . needs three . . . three receivers that's . . . fifteen dollars.

ALVAREZ: Throw in dozens of homes every week and the losses are adding up fast.

ALVAREZ (questioning a room full of technicians): How many of you here by a show of hands have had $200 taken out of your paycheck? (Accompanying video shows virtually every technician in the room raising his hand.)

MARTINEZ: More.

ALVAREZ (reporting): Want to avoid a deduction on your paycheck? Well, according to this group, supervisors have ordered them to do or say whatever it takes.

MARTINEZ: Tell the customer whatever you have to tell them. Tell them if these phone lines are not connected the receiver will blow up.

ALVAREZ (interviewing): You've been told to tell customers that . . .

MARTINEZ: We've been told to say that. Whatever it takes to get the phone line into that receiver.

ALVAREZ (reporting): That lie could cost customers big money . . . the fee to have a phone line installed could be as high as $52.00 per room . . . want a wireless phone jack? That will cost you another 50 bucks.

ALVAREZ (shown outside Respondent's Orlando office attempting to speak to Villa): We're hoping to talk to you guys about some concerns raised by your employees.

VILLA: Sorry . . . guys, I need you to walk out of the office; this is a private office.

ALVAREZ (reporting): The bosses at MasTec's Orlando office did not want to comment.

ALVAREZ (seen attempting to interview Villa): We have employees saying that you asked them to lie. . . .

VILLA: Please . . . thank you. . . .

ALVAREZ: . . . to customers. Is that true? (This exchange while video shows Alvarez and camera crew being ushered out of the office.)

ALVAREZ (again in reporting mode): But statements from their corporate office and from DirecTV

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

make it clear the policy of deducting money from employees' paychecks will continue.  A DirecTV spokesman said techs who don't hook up phone lines are quote 'denying customers the full benefit and function of their DirecTV system.'  These men disagree and say the policy has done nothing but create an environment where lying to customers is part of the job.

ALVAREZ (interviewing): It's either lie or lose money.

TECHNICIAN SEBASTIAN ERISTE: We don't have a choice.

ALVAREZ (reporting): Now . . . during our investigation, MasTec decided to reimburse money to some techs who had met a certain quota but the policy continues and one reason could be that DirecTV does keep track of their customers' viewing habits through those phone lines. Now just last year, DirecTV paid out a $5 million settlement with Florida and 21 other states for deceptive practices and now, because of our story, the attorney general's office is looking into this newest issue so we'll, of course, keep you posted.

NEWS ANCHOR 2: You think they would have learned the first time.

ALVAREZ: You think so. We'll see what happens.

NEWS ANCHOR 2: Thank you, Nancy.

This report reaired, in slightly different versions, over a 2-day period.  Chris Brown sent the recorded broadcasts to his superiors, who, in turn, forwarded them to DirecTV.  After discussing their mutual concerns, DirecTV's Crawford told MasTec's Retherford that he did not want any of the technicians who appeared on the broadcast to represent his company in customers' homes.

Thereafter, Retherford directed Chris Brown to identify the technicians who appeared in the newscast.  After receiving the list of names, on May 2, Retherford instructed Brown to tell Villa to notify each of the identified technicians that he was being terminated "at will." Following Retherford's directions, Villa informed the technicians of their terminations at the end of the workday on May 3.

### The Judge's Decision

The judge initially found that the technicians' statements related to an ongoing labor dispute.  He stated that the content of the news report establishes that "[a]ny reasonable viewer would understand . . . that the technicians . . . were concerned about their wages" and the underlying labor dispute remained evident alongside the "consumer protection aspect" of the story.

The judge found, however, that the statements broadcast by Channel 6 "were so 'disloyal, reckless, and maliciously untrue' as to lose the Act's protection."  Although he found Selby's opening remark, that the technicians were "asking to be treated fairly" was, "standing alone, clearly protected," he described statements by Martinez, Fowler, and Eriste, indicating they were instructed or encouraged to lie to customers, as "highly inflammatory and damaging to Respondents' reputation." The judge also found the story's emphasis on technicians' "lies" translating into higher costs for customers to be "inaccurate and misleading," observing that extra charges are not incurred with standard connections, but only with custom installations.  In addition, because technicians were subject to backcharges only if they failed to connect at least half of the newly-installed receivers to phone lines, the judge found that their claim that they "had to lie to customers to avoid" financial penalties was not true.  Further, despite the technicians' representations, he found the Respondents had "never explicitly told [them] to lie" and had even suggested other ways for them to meet the connection requirement. Moreover, because the judge found that MasTec's supervisor Brown was joking and did not actually expect technicians to tell customers that an unconnected receiver would "blow up," he concluded that Martinez' reference to Brown's statement was "deliberately misleading" and intended to harm his employer's reputation.  Finally, because technician Guest had incurred pay deductions for reasons other than the new wage policy, the judge concluded that by raising his hand in response to Alvarez' question about backcharges, Guest "demonstrated a willingness to mislead the public."

The judge also concluded that the newscast's focus on the Respondents' business practices overshadowed the labor dispute and that the technicians' attitude during the broadcast was, as stated in *Veeder-Root Co.*, 237 NLRB 1175, 1177 (1978), "flagrantly disloyal, wholly incommensurate with any grievances they had, and manifested by public disparagement of [the Respondents'] product and undermining of their reputation."  The judge further concluded that although only two of the alleged discriminatees—Fowler and Eriste—made unprotected remarks, the appearance of the other technicians lent tacit support to their statements.  He therefore found that all of the technicians lost the protection of the Act.  For the reasons discussed below, we disagree.

### Analysis

Section 7 of the Act provides, in part, that "[e]mployees shall have the right . . . to engage in . . . concerted activities for the purpose of . . . mutual aid or protection."  However, that right is not without limita-

MASTEC ADVANCED TECHNOLOGIES

tion.  In *Jefferson Standard*, the Court upheld the employer's discharge of employees who publicly criticized both the quality of the employer's product and its business practices without the employees relating their complaints to any labor controversy.  The Court found that the employees' conduct amounted to disloyal disparagement of their employer and was outside the Act's protection.

In cases decided since *Jefferson Standard*, "the Board has held that employee communications to third parties in an effort to obtain their support are protected where the communication indicated it is related to an ongoing dispute between the employees and the employers and the communication is not so disloyal, reckless or maliciously untrue as to lose the Act's protection."[9]

The first prong of this test is not at issue here.  The Respondents do not contest the judge's finding, with which we agree, that the employee communications here were clearly related to their pay dispute.  As to the second prong of the test, we find that the judge clearly erred in finding that the employee communications and/or participation in the Channel 6 newscast were either maliciously untrue or so disloyal and reckless as to warrant removal of the Act's protection.

Statements are maliciously untrue and unprotected, "if they are made with knowledge of their falsity or with reckless disregard for their truth or falsity.  See, e.g., *TNT Logistics North America, Inc.*, 347 NLRB 568, 569 (2006), revd. sub nom. *Jolliff v. NLRB*, 513 F.3d 600 (6th Cir. 2008).  The mere fact that statements are false, misleading or inaccurate is insufficient to demonstrate that they are maliciously untrue.  See, e.g., *Sprint/United Management Co.*, 339 NLRB 1012, 1018 (2003)."[10]

None of the statements made by the technicians were maliciously untrue under these well-established legal principles.  Indeed, for the most part, the statements were accurate representations of what the Respondents had instructed the technicians to tell customers.  Contrary to the judge, the technicians *were* essentially told to lie, as certain technicians stated during the telecast.  The record clearly establishes that although the Respondents may have avoided expressly using the word "lie" when suggesting ways to overcome obstacles to making receiver-phone line connections, both Respondents affirmatively encouraged the technicians to do just that.  Thus, a Mas-Tec supervisor told the technicians to say "the receiver

would not work" without the connection.  Similarly, DirecTV Vice President Brown advised technicians to say that the hookup to the phone was "a mandatory part of the installation" and needed "for the equipment to function correctly."  Indeed, Brown instructed technicians to tell customers "whatever you have to tell them" and "whatever it takes" to make the connection.  The technicians would readily understand these instructions to include "lie if you have to."  Brown's joking suggestion to tell customers that an unconnected receiver would "blow up" underscored that message, as it undoubtedly was meant to do.  Thus, whether the Respondents' officials expressly told the technicians to lie is immaterial.  They expressly encouraged technicians to make statements known by the Respondents' managers to be false and intended to deceive customers into believing, erroneously, that their satellite receivers would not work if they were not connected to a land line telephone.

Similarly, the technicians did not make maliciously false statements by failing to specify that they would be back charged only if they failed to connect 50 percent of the receivers they installed.  The statements the technicians did make fairly reflected their personal experiences under the new pay scheme.  Almost all of them indicated that they had failed to achieve at least a 50-percent connection rate, and some had incurred significant backcharges as a result.  In any event, the failure to fully explain the 50-percent connection rule was at most an inaccuracy.[11]  There is no basis in the record to find that the technicians knowingly and maliciously withheld that information in order to mislead the viewing public.[12]

---

[9] *Mountain Shadows Golf Resort*, 330 NLRB 1238, 1240 (2000) (footnote omitted).

[10] *Valley Hospital Medical Center*, 351 NLRB 1250, 1252–1253 (2007), enfd. sub nom. *Nevada Service Employees Local 1107 v. NLRB*, 358 Fed. Appx. 783 (9th Cir. 2009).  See generally *Linn v. United Plant Guard Workers of America, Local 113*, 383 U.S. 53 (1966).

[11] The judge opined that the 50-percent connection threshold was "not impossible to meet, despite the employees [sic] excuses."  This, of course, proves nothing, because the record does not show how many employees had to lie or engage in other deceptive practices in order to meet the threshold.

[12] There is likewise no basis for finding that technician Guest individually engaged in maliciously false conduct by raising his hand in response to Alvarez' question about how many people had $200 deducted from their pay.  Guest's response was in fact an accurate answer to the question posed.  He had experienced deductions in that amount, although not all due to the failure to achieve a 50-percent connection rate.  We cannot find that Guest must have understood Alvarez' question as intended to address only such deductions (he specifically testified to the contrary) and that he maliciously sought to mislead the public by raising his hand.

As noted, the judge also referred to statements implying that lying to customers about the need for telephone connections would lead to higher costs as misleading and inaccurate because extra charges would be imposed only for a custom connection.  While those statements may have been misleading, there is no showing that they were made with knowledge that they were only partially true or with reckless disregard for their truth or falsity.  In any event, those statements were made by Alvarez and other Channel 6 personnel in voiceovers or on the day of the telecast, not by the technicians.  Technicians Guest and Fowler

108                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

In sum, we find that almost all of the statements made by the technicians during the Channel 6 newscast were truthful representations of what the Respondents told them to do. Any arguable departures from the truth were no more than good-faith misstatements or incomplete statements, not malicious falsehoods justifying removal of the Act's protection.

We also find that none of the technicians' statements constituted unprotected disloyalty or reckless disparagement of the Respondents' services. Statements have been found unprotected where they constitute "a sharp, public, disparaging attack upon the quality of the company's product and its business policies, in a manner reasonably calculated to harm the company's reputation and reduce its income."[13] The Board has stated that it will not find a public statement unprotected unless it is "flagrantly disloyal, wholly incommensurate with any grievances which they might have."[14] Further, "[i]n determining whether an employee's communication to a third party constitutes disparagement of the employer or its product, great care must be taken to distinguish between disparagement and the airing of what may be highly sensitive issues."[15]

In this case, the technicians participated in the Channel 6 newscast only after repeated unsuccessful attempts to resolve their pay dispute in direct communications with the Respondents. The newscast shed unwelcome light on certain deceptive business practices, but it was nevertheless directly related to the technicians' grievance about what they considered to be an unfair pay policy that they believed forced them to mislead customers. While the technicians may have been aware that some consumers

might cancel the Respondents' services after listening to the newscast, there is no evidence that they intended to inflict such harm on the Respondents, or that they acted recklessly without regard for the financial consequences to the Respondents' businesses.[16] We therefore find that the technicians did not engage in unprotected disloyal or reckless conduct, as previously defined by Board and court precedent.

Based on the foregoing, we find that the technicians' participation in the Channel 6 newscast was protected concerted activity directly and expressly related to and in furtherance of an ongoing labor dispute. Accordingly, we reverse the judge and find that by causing the discharge of the technicians for their participation in the newscast, and by discharging them, Respondents DirecTV and MasTec, respectively, violated Section 8(a)(1) of the Act.[17]

CONCLUSIONS OF LAW

1. By terminating employees Jouvani Alicea, Marlon Binet, Christopher Creary, Leroy Davis, Donovan Edwards, Sebastian Eriste, Hugh Fowler, Joseph Guest, Delroy Harrison, James Hehmann, Mark Hemann, Michael Hermitt, Federico Hoy, Fernando Hoy, Ariel Kelly, Shervoy Lopez, Ricardo Perlaza, Sergio Pitta, Noel Rodriguez, Rudy Rodriguez, Fernando Sando, Olmy Talent, Diego Velez, Nerio Vera, Ralph Wilson, and Carlos Zambrano for engaging in protected concerted activities, Respondent MasTec Advanced Technologies, a division of MasTec, Inc. has engaged in unfair labor practices

---

[13] *NLRB v. Electrical Workers Local 1229 (Jefferson Standard)*, 346 U.S. 464, 472 (1953), quoted with approval in *Valley Hospital Medical Center*, 351 NLRB at 1252. While Member Hayes agrees with Chairman Liebman that it is unnecessary to reconsider this precedent in the circumstances of this case, he would in any event not join Member Becker in abandoning consideration of whether nondefamatory disparagement or disloyal remarks related to an ongoing labor dispute warrant forfeiture of the Act's protection. Further, inasmuch as the Board finds that none of the technicians made unprotected statements during the newscast, Member Hayes does not address whether, if such statements had been made, they would be a basis for finding that employees who participated in the newscast but did not speak or raise their hands would also forfeit the Act's protection.

[14] *Five Star Transportation, Inc.*, 349 NLRB 42, 45 (2007), enfd. 522 F.3d 46 (1st Cir. 2008), quoting *Veeder-Root Co.*, 237 NLRB 1175, 1177 (1978).

[15] *Allied Aviation Service Co. of New Jersey, Inc.*, 248 NLRB 229, 231 (1980), enfd. 636 F.2d 1210 (3d Cir. 1980).

[16] See *Community Hospital of Roanoke Valley*, 220 NLRB 217, 223 (1975), enfd. 538 F.2d 607 (4th Cir. 1976) (employee's comments on television program were protected where they were specifically related to employees' efforts to improve wages and working conditions and where there was no deliberate intent to impugn employer). Accord: *NLRB v. Circle Bindery, Inc.*, 536 F.2d 447, 452 (1st Cir. 1976) (explaining that "concerted activity that is otherwise proper does not lose its protected status simply because prejudicial to the employer").

[17] We find no merit in DirecTV's alternative argument that the technicians' conduct was unprotected because they engaged in a partial strike or intermittent strikes. The record does not support finding that the technicians engaged in either alleged action. In any event, it is undisputed that MasTec fired the technicians, at DirecTV's behest, solely because their statements on the telecast were assertedly "disloyal, reckless, and maliciously untrue" and disparaging of the Respondents' businesses. MasTec does not argue that it fired them for any other reason or that it would have done so even if they had not participated in the telecast. Cf. *Wright Line*, 251 NLRB 1083 (1980), approved in *NLRB v. Transportation Management Corp.*, 462 U.S. 393 (1983).

DirecTV also argues that Hugh Fowler's discharge was lawful because he obtained the names and telephone numbers of other technicians from company files under false pretenses. Again, however, MasTec does not assert that this conduct played any part in Fowler's discharge. *Wright Line*, supra. Accordingly, Fowler's other conduct does not furnish the Respondents with a defense to his discharge.

Case 1:20-mc-00022-GMH   Document 2   Filed 04/10/20   Page 32 of 49
USCA Case #11-1274      Document #1816471      Filed: 11/19/2019      Page 7 of 23

109
MASTEC ADVANCED TECHNOLOGIES

within the meaning of Section 8(a)(1) and Section 2(6) and (7) of the Act.

2. By causing the termination of the above employees of Respondent MasTec Advanced Technologies, a Division of MasTec, Inc., Respondent DirecTV, Inc. has engaged in unfair labor practices within the meaning of Section 8(a)(1) and Section 2(6) and (7) of the Act.

3. By maintaining a confidentiality policy that interferes with, restrains, and coerces employees in the discussion of their wages, hours, and terms and conditions of employment, and by maintaining an overly broad solicitation and distribution rule that also required employees to obtain permission to engage in protected concerted activity, Respondent MasTec Advanced Technologies, a division of MasTec, Inc. has engaged in unfair labor practices affecting commerce within the meaning of Section 8(a)(1) and Section 2(6) and (7) of the Act.

4. By threatening employees with facility closure and other unspecified reprisals for engaging in protected concerted activity, Respondent MasTec Advanced Technologies, a Division of MasTec, Inc. has engaged in unfair labor practices affecting commerce within the meaning of Section 8(a)(1) and Section 2(6) and (7) of the Act.

### The Remedy

Having found that Respondent MasTec Advanced Technologies, a Division of MasTec, Inc. has engaged in certain unfair labor practices, we shall order it to cease and desist and to take certain actions designed to effectuate the policies of the Act. We shall order Respondent MasTec Advanced Technologies, a Division of MasTec, Inc. to offer the unlawfully discharged employees immediate and full reinstatement to their former positions or, if those positions no longer exist, to substantially equivalent positions, without prejudice to their seniority or other rights and privileges previously enjoyed, and make them whole for any loss of earnings and other benefits, jointly and severally with Respondent DirecTV, Inc., computed on a quarterly basis from the date of termination to the date of a proper offer of reinstatement, less any net interim earnings, as prescribed in *F. W. Woolworth Co.*, 90 NLRB 289 (1959), plus interest as computed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB 6 (2010).

To the extent that it has not already done so, Respondent MasTec Advanced Technologies, a Division of MasTec, Inc. shall be required to rescind the confidentiality, solicitation, and distribution rules that appeared in its handbook in effect in March 2006, and to notify all employees who were issued the handbook containing the

unlawful rules that those rules have been rescinded and will no longer be enforced.

We agree with the General Counsel that because the handbook containing the unlawful rules was in effect at all of MasTec's locations nationwide, the judge erred in failing to order MasTec to post the notice to employees at all its facilities. As the Board stated in *Guardsmark, LLC*,[18] "we have consistently held that, where an employer's overbroad rule is maintained as a companywide policy, we will generally order the employer to post an appropriate notice at all of its facilities where the unlawful policy has been or is in effect."[19] Accordingly, Respondent MasTec Advanced Technologies, a division of MasTec, Inc. shall be required to post the attached notice marked "Appendix A" at its Orlando, Florida facility, and to post the notice marked "Appendix B" at all its other facilities. MasTec shall also be required to post at its Orlando, Florida facility the attached notice marked "Appendix C" after being signed by Respondent DirecTV, Inc.

Having found that Respondent DirecTV, Inc., interfered with, restrained, and coerced employees in the exercise of their Section 7 rights by causing Respondent MasTec Advanced Technologies, a Division of MasTec, Inc. to discharge certain employees working at its Orlando, Florida facility on May 3, 2006, we shall order it to cease and desist and to take certain actions intended to effectuate the policies of the Act. We shall order Respondent DirecTV, Inc. to make the unlawfully discharged employees whole, jointly and severally with Respondent MasTec Advanced Technologies, a Division of MasTec, Inc., in the manner set forth above. Respondent DirecTV shall also be required to mail a signed copy of the attached notice to employees marked "Appendix C" to Respondent MasTec for posting at the Orlando, Florida facility of MasTec.

### ORDER

The National Labor Relations Board adopts the recommended Order of the administrative law judge as modified and set forth in full below and orders that

A. Respondent MasTec Advanced Technologies, a Division of MasTec, Inc., Orlando, Florida, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Terminating any employee for engaging in protected concerted activities.

(b) Maintaining any rules, including confidentiality rules, that unlawfully restrict employees' ability to dis-

---

[18] 344 NLRB 809 (2005).
[19] Id. at 812.

110                      DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

cuss their wages, hours, and other terms and conditions of employment with anyone.

(c) Maintaining any overly broad solicitation and distribution rules or other rules that require employees to obtain permission before engaging in protected concerted activities.

(d) Threatening employees with facility closure and other unspecified reprisals because they engage in protected concerted activities.

(e) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Within 14 days from the date of this Order, offer Jouvani Alicea, Marlon Binet, Christopher Creary, Leroy Davis, Donovan Edwards, Sebastian Eriste, Hugh Fowler, Joseph Guest, Delroy Harrison, James Hehmann, Mark Hemann, Michael Hermitt, Federico Hoy, Fernando Hoy, Ariel Kelly, Shervoy Lopez, Ricardo Perlaza, Sergio Pitta, Noel Rodriguez, Rudy Rodriguez, Fernando Sando, Olmy Talent, Diego Velez, Nerio Vera, Ralph Wilson, and Carlos Zambrano full reinstatement to their former jobs, or if those jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed.

(b) Make the above-named employees whole for any loss of earnings and other benefits suffered as a result of the discrimination against them, jointly and severally with Respondent DirecTV, Inc., in the manner set forth in the remedy section of this decision.

(c) Within 14 days from the date of this Order, remove from its files any reference to the unlawful discharges, and within 3 days thereafter, notify the employees in writing that this has been done and that the discharges will not be used against them in any way.

(d) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of back pay due under the terms of this Order.

(e) Rescind the confidentiality policy and the solicitation and distribution rules as they existed in March 2006.

(f) Notify all employees who received the employee handbook that existed in March 2006 that these rules have been rescinded and will no longer be enforced.

(g) Within 14 days after service by the Region, post at its facility in Orlando, Florida, copies of the attached notices marked "Appendix A" and "Appendix C" and within that same time period post at all its other facilities, nationwide, copies of the attached notice marked "Appendix B."[20] Copies of the notices, on forms provided by the Regional Director for Region 12, after being signed by the Respondents' authorized representatives, shall be posted by Respondent MasTec and maintained for 60 consecutive days in conspicuous places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the facilities involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notices to all current employees and former employees employed by the Respondent at any time since March 2006.

(h) Within 21 days after the service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

B. The Respondent, DirecTV, Inc., El Segundo, California, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Maintaining any rules, including confidentiality rules, that restrict your ability to discuss your wages, hours, and terms and conditions of employment with anyone.

(b) Causing the termination of or otherwise discriminating against any employee for engaging in protected concerted activities.

(c) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Make Jouvani Alicea, Marlon Binet, Christopher Creary, Leroy Davis, Donovan Edwards, Sebastian Eriste, Hugh Fowler, Joseph Guest, Delroy Harrison, James

---

[20] If this Order is enforced by a judgment of a United States court of appeals, the words in the notices reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

Case 1:20-mc-00022-GMH   Document 2   Filed 04/10/20   Page 34 of 49
USCA Case #11-1274    Document #1816471    Filed: 11/19/2019    Page 9 of 23

111
MASTEC ADVANCED TECHNOLOGIES

Hehmann, Mark Hemann, Michael Hermitt, Federico Hoy, Fernando Hoy, Ariel Kelly, Shervoy Lopez, Ricardo Perlaza, Sergio Pitta, Noel Rodriguez, Rudy Rodriguez, Fernando Sando, Olmy Talent, Diego Velez, Nerio Vera, Ralph Wilson, and Carlos Zambrano whole for any loss of earnings and other benefits suffered as a result of the discrimination against them, jointly and severally with Respondent MasTec, Inc., in the manner set forth in the remedy section of this decision.

(b) Within 14 days after service by the Region, mail a singed copy of the attached notice marked "Appendix C"[21] to Respondent MasTec for posting at MasTec's Orlando, Florida facility.

(c) Within 21 days after the service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

MEMBER BECKER, concurring.

I concur with the result reached by my colleagues. I write separately because I believe the Supreme Court's decisions in *NLRB v. Electrical Workers Local 1229 (Jefferson Standard)*, 346 U.S. 464 (1953), *Linn v. Plant Guards*, 383 U.S. 53 (1966), and *NLRB v. Washington Aluminum Co.*, 370 U.S. 9 (1962), require us to apply *Jefferson Standard* in a less expansive manner consistent with the facts of that case.[1]

The critical fact here, as my colleagues recognize, is that the statements at issue were expressly and directly related to the labor dispute. The statements concerned what the Respondent had asked the employees to do and the resulting implications for their wages. That critical fact takes this case outside the scope of the unprotected conduct defined in *Jefferson Standard*. The Court in that seminal case repeatedly emphasized that the speech at issue was not expressly tied to a labor dispute, and that was why it could constitute cause for discharge as product disparagement or disloyalty. The Court made clear that the employees' "attack related itself to no labor practice of the company. It made no reference to wages, hours or working conditions. The policies attacked were those of finance and public relations for which management, not technicians, must be responsible. The attack

asked for no public sympathy or support." 346 U.S. at 476. The Court reiterated, "While they were also union men and leaders in the labor controversy, they took pains to separate those categories. In contrast to their claims on the picket line as to the labor controversy, their handbill of August 24 omitted all reference to it. The handbill diverted attention from the labor controversy. It attacked public policies of the company which had no discernible relation to that controversy." Id. at 476. The Court concluded: "the findings of the Board effectively separate the attack from the labor controversy and treat it solely as one made by the company's technical experts upon the quality of the company's product. As such, it was as adequate a cause for the discharge of its sponsors as if the labor controversy had not been pending. The technicians, themselves, so handled their attack as thus to bring their discharge under § 10(c)." Id. at 477.

Here, in contrast, the employees' statements were expressly and intimately linked to the labor dispute. The line of product disparagement and disloyalty cases running from *Jefferson Standard* has no application. Thus, because the employees' speech was clearly concerted activity for mutual aid and protection, it was protected unless it was uttered with actual malice. That standard is consistent with Congress' intent to protect concerted activity for mutual aid and protection even if the conduct—a strike, for example—inflicts economic injury on the employer. That standard also makes sense as a matter of policy, because so long as the statements are expressly linked to the labor dispute, the public will evaluate them within that context. As the Supreme Court recognized in *Linn*, and as the consuming public understands, "Labor disputes are ordinarily heated affairs . . . . Both labor and management often speak bluntly and recklessly, embellishing their respective positions with imprecatory language." 383 U.S. at 58. In other words, when the statements are expressly linked to a labor dispute, the public will take them with a grain of salt. The Court's holding in *Linn* further supports the proposition that otherwise protected statements do not lose protection simply because they "are erroneous and defame one of the parties to the dispute." 383 U.S. at 61. Such statements are protected unless they are made with actual malice. This standard is clear and has been elaborated by the courts under both *Linn* and *New York Times v. Sullivan*, 376 U.S. 254 (1964). Thus, I would end the majority opinion after finding, as my colleagues do, that the statements were not made with actual malice.

My colleagues go on to analyze whether the technicians' statements here are "so disloyal . . . as to lose the Act's protection." Not only is that standard so vague as to chill the exercise of Section 7 rights, it is in tension

---

[21] See fn. 20, *supra*.

[1] I also write separately to make clear that the majority opinion should not be read to in any way endorse the judge's view that the employees who attended the taping but said nothing could, nevertheless, be found to have engaged in unprotected disparagement. As has been found in all prior cases, unprotected disparagement requires individual, affirmative conduct. The employees who did not speak or raise their hands during the broadcast did not engage in even arguably unprotected conduct.

112                        DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

with the central purpose of Section 7, which is to grant employees a right to engage in concerted activity for mutual aid and protection *even when* the exercise of that right might otherwise be considered disloyalty.  Employees have a right to strike despite the disloyalty involved in refusing to work.  Employees have a right to ask consumers to boycott their employer in support of the employees' position in a labor dispute despite the disloyalty involved in seeking to reduce their employer's business.[2]  Similarly, employees have the right to criticize their employer's product or services so long as the criticism is expressly and directly tied to a labor dispute and is not made with actual malice.

My colleagues find that the statements were not reckless, but instead a last resort to resolve a legitimate grievance.  While I agree with their finding, the Supreme Court made clear in *Washington Aluminum* that concerted activity for mutual aid and protection need not be measured or proportional in order to be protected.  Even if such activity is "unnecessary and unwise," it remains protected.  330 U.S. at 16.  As in *Washington Aluminum*, the employees here "were part of a small group of employees who were wholly unorganized.  They had no bargaining representative and, in fact, no representative of any kind to present their grievances to their employer.  Under these circumstances, they had to speak for themselves as best they could."  Id. at 14.

Finally, my colleagues draw the applicable standard from *Mountain Shadow Golf Resort*, 330 NLRB 1238 (2000), but there, as in *Jefferson Standard*, the handbill at issue "did not mention the problems the employees' union was having negotiating with the Respondent, and bore no indication that it was written by or on behalf of any employee of the Respondent."  Id. at 1241.  In other words, the statements, like those in *Jefferson Standard*, but unlike those in the instant case, were not expressly and directly tied to any labor dispute.  *Mountain Shadow* is thus distinguishable on its facts and the standard it articulates is overbroad for the reasons explained above.[3]

---
[2] As Judge Learned Hand stated many years ago in *NLRB v. Peter Cailler Kohler Swiss Chocolates Co.*, 130 F.2d 503, 506 (2d Cir. 1942):

> Such [protected] activities may be highly prejudicial to [the] employer; his customers may refuse to deal with him, he may incur the enmity of many in the community whose disfavor will bear hard upon him; but the statute forbids him by a discharge to rid himself of those who lay such burdens upon him.  Congress has weighed the conflict of his interest with theirs, and has pro tanto shorn him of his powers.

[3] Similarly, the majority cites *Five Star Transportation, Inc.*, 349 NLRB 42 (2007), but the statements found to be unprotected disparagement in that case related to "incidents that had occurred approximately 7 years prior to the instant labor dispute and that, significantly, had no relation to the drivers' concern that the Respondent would not maintain the terms and conditions of employment that the drivers had

Because the majority, based on *Mountain Shadow*, reads *Jefferson Standard* and its progeny too broadly, I concur only in the result.

CHAIRMAN LIEBMAN, concurring.

I join fully in the Board's opinion.  In his concurrence, Member Becker argues—and he may well be correct—that the Board's case law since *Jefferson Standard* has too expansively applied that decision.  But no party here has asked us to revisit this long established jurisprudence, and even under the Board's precedent as it has evolved, the employee statements at issue in this case did not lose the protection of the Act.  As he acknowledges, the outcome in this case would be the same under Member Becker's view of the law.  Our decision today does nothing to further broaden the Board's reading of *Jefferson Standard*, nor does it foreclose a future reexamination of our doctrine, in an appropriate case.

APPENDIX A

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

  Form, join, or assist a union
  Choose representatives to bargain with us on your behalf
  Act together with other employees for your benefit and protection
  Choose not to engage in any of these protected activities.

WE WILL NOT discharge or otherwise discriminate against you for engaging in protected concerted activity.

WE WILL NOT maintain any rules, including confidentiality rules, that unlawfully restrict your ability to discuss your wages, hours, and terms and conditions of employment with anyone.

WE WILL NOT maintain any overly broad solicitation and distribution rules or other rules that require you to obtain permission before engaging in protected concerted activities.

WE WILL NOT threaten to close the facility or engage in other unspecified reprisals because you engage in protected concerted activities.

---
negotiated with their predecessor employer]."  Id. at 46.  *Five Star* is thus similarly inapposite.

MASTEC ADVANCED TECHNOLOGIES

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL, within 14 days from the date of this Order, offer Jouvani Alicea, Marlon Binet, Christopher Creary, Leroy Davis, Donovan Edwards, Sebastian Eriste, Hugh Fowler, Joseph Guest, Delroy Harrison, James Hehmann, Mark Hemann, Michael Hermitt, Federico Hoy, Fernando Hoy, Ariel Kelly, Shervoy Lopez, Ricardo Perlaza, Sergio Pitta, Noel Rodriguez, Rudy Rodriguez, Fernando Sando, Olmy Talent, Diego Velez, Nerio Vera, Ralph Wilson, and Carlos Zambrano reinstatement to their former jobs or, if those jobs no longer exist, to substantially equivalent positions without prejudice to their seniority or other rights and privileges they previously enjoyed.

WE WILL, jointly and severally with DirecTV, Inc., make those employees whole for any loss of earnings and other benefits resulting from their discharge, less any net interim earnings, plus interest.

WE WILL, within 14 days from the date of the Board's Order, remove from our files any reference to the unlawful discharges, and WE WILL, within 3 days thereafter, notify each of the unlawfully discharged employees in writing that this has been done and that their discharges will not be used against them in any way.

WE WILL rescind the confidentiality policy and the solicitation and distribution rules as they existed in March 2006 and WE WILL notify all employees who received the handbook that existed in March 2006 that these rules have been rescinded and will no longer be enforced.

MASTEC ADVANCED TECHNOLOGIES, A
DIVISION OF MASTEC, INC.

APPENDIX B
NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT maintain any rules, including confidentiality rules, that restrict your ability to discuss your wages, hours, and terms and conditions of employment with anyone.

WE WILL NOT maintain any overly broad solicitation and distribution rules or other rules that require you to obtain permission before engaging in protected concerted activities.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce any employees in the exercise of the rights listed above.

WE WILL rescind the confidentiality policy and the solicitation and distribution rules as they existed in March 2006 and WE WILL notify all employees who received the handbook that existed in March 2006 that these rules have been rescinded and will no longer be enforced.

MASTEC ADVANCED TECHNOLOGIES, A
DIVISION OF MASTEC, INC.

APPENDIX C
NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT cause the termination of or otherwise discriminate against employees for engaging in protected concerted activity.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce any employees in the exercise of the rights listed above.

WE WILL, jointly and severally with MasTec Advanced Technologies, a Division of MasTec, Inc., make Jouvani Alicea, Marlon Binet, Christopher Creary, Leroy Davis, Donovan Edwards, Sebastian Eriste, Hugh Fowler, Joseph Guest, Delroy Harrison, James Hehmann, Mark Hemann, Michael Hermitt, Federico Hoy, Fernando Hoy, Ariel Kelly, Shervoy Lopez, Ricardo Perlaza, Sergio Pitta, Noel Rodriguez, Rudy Rodriguez, Fernando Sando, Olmy Talent, Diego Velez, Nerio Vera, Ralph Wilson, and Carlos Zambrano whole for any loss of earnings and

114                           DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

other benefits resulting from their discharge, less any net interim earnings, plus interest.

DIRECTV, INC.

*Christopher C. Zerby, Esq.* and *Rachel Harvey, Esq.,* for the General Counsel.

*Gavin S. Appleby, Esq.* and *Jenna S. Barresi, Esq.,* for the Respondent MasTec, Inc.

*Curtis L. Mack, Esq.* and *Brennan W. Bolt, Esq.,* for the Respondent DirecTV, Inc.

### DECISION

#### STATEMENT OF THE CASE

MICHAEL A. MARCIONESE, Administrative Law Judge. I heard this case in Orlando, Florida, on July 23–25, 2007. Joseph Guest, an individual, filed the charge in Case 12–CA–24979 on May 5, 2006,[1] and amended it on June 29 and August 21. Guest filed the charge in Case 12–CA–25055 on June 29, and amended it on August 21. Based upon these charges, the consolidated complaint issued on April 30, 2007, alleging that Respondents MasTec Advanced Technologies, a Division of MasTec, Inc. (Respondent MasTec), and DirecTV, Inc. (Respondent DirecTV), violated Section 8(a)(1) of the Act in connection with the termination of 26 individuals employed by MasTec to perform services under a contract between MasTec and DirecTV.[2] Specifically, the consolidated complaint alleges that the named employees engaged in protected concerted activities during the period January through March, 2006, including appealing to the public by participating in the production of a television news report that aired on May 1 and 2. It is further alleged that DirecTV attempted to cause and caused MasTec to terminate the 27 employees, and that MasTec terminated these employees, because of their participation in this protected concerted activity. The consolidated complaint also alleges that Christopher Brown and Noel Muniz, alleged supervisors of Respondent MasTec, threatened employees with discharge and other unspecified reprisals because of their protected concerted activity. Finally, the consolidated complaint alleges that Respondent MasTec violated Section 8(a)(1) of the Act by maintaining confidentiality, solicitation, and distribution rules that allegedly infringed employees' exercise of their Section 7 rights.

Respondent MasTec filed its answer to the consolidated complaint on May 14, 2007, denying that it committed the alleged unfair labor practices and asserting several affirmative defenses. Specifically, Respondent MasTec asserted that the allegedly unlawful rules had been rescinded and that the employees who were terminated had been engaged in activities that were not protected under the Act and/or were terminated for cause unrelated to any concerted activity. Respondent DirecTV also filed its answer to the consolidated complaint on May 14, 2007, denying the alleged unfair labor practices and raising similar affirmative defenses. At the hearing, Respondents amended their answers to withdraw those affirmative defenses suggesting that the employees were terminated for reasons other than their participation in the television broadcast.

As framed by the amended pleadings, the principal issue in this case is whether the 26 employees who participated in the news report, as broadcast several times on the local television station, lost the protection of the Act because several employees made statements during the broadcast that allegedly disparaged the Respondents and their products and services or were otherwise disloyal to their employer. Resolution of this issue is governed by the Supreme Court's decision in *NLRB v. Electrical Workers Local 1229 (Jefferson Standard)*, <u>346 U.S. 464</u> (1953), and its progeny. The pleadings also raise other issues, including whether Respondent DirecTV caused Respondent MasTec to terminate the employees and whether the two supervisors alleged in the complaint made statements that constitute unlawful threats under the Act. The legality of Respondent MasTec's rules is a separate issue unrelated to the allegedly unlawful terminations.

On the entire record,[3] including my observation of the demeanor of the witnesses, and after considering the briefs filed by the General Counsel, Respondent MasTec and Respondent DirecTV, I make the following

#### FINDINGS OF FACT

#### I. JURISDICTION

Respondent MasTec, a corporation, provides television satellite installation and maintenance services for Respondent DirecTV from several facilities in Florida and other states, including the facility in Orlando, Florida, that is involved in this proceeding. In conducting its business operations, Respondent MasTec annually purchases and receives at its Florida facilities materials valued in excess of $50,000 directly from points outside the State of Florida. Respondent MasTec admits and I find that it is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

Respondent DirecTV, a corporation, with its principal office and a place of business in El Segundo, California, is engaged in the business of providing television programming via satellite throughout the United States, including in the State of Florida. In conducting its business operations, Respondent DirecTV derived gross revenues in excess of $500,000 and provided services valued in excess of $50,000 in states other than the State of California. Respondent DirecTV admits and I find that it is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

#### II. ALLEGED UNFAIR LABOR PRACTICES

##### A. Respondent MasTec's Rules

There is no dispute that the employee handbook in effect in

---

[1] All dates are in 2006, unless otherwise indicated.

[2] The consolidated complaint originally named 27 alleged discriminatees. At the hearing, the General Counsel amended the complaint to delete one individual, James Tuckfield, after evidence was presented showing that he had not been discharged.

[3] The General Counsel's unopposed motion to correct the transcript is granted, as is Respondent DirecTV's unopposed motion to substitute hearing exhibit. The respective motions are received in evidence as ALJ Exhs. 1 and 2.

MASTEC ADVANCED TECHNOLOGIES

March 2006 covering Respondent MasTec's employees contained the following provisions

CONFIDENTIALITY POLICY

No team member may use Confidential Information (as defined below) to personally benefit himself, herself, or others. In the handling of all Confidential Information, team members must not communicate such information to anyone, inside or outside the Company (including to family members), except on a strict "need-to-know" basis and under circumstances that make it reasonable to believe that the information will not be used or misused or improperly disclosed by the recipient. Team members must be careful to avoid discussing Confidential Information in any place (for instance, in restaurants, on public transportation, in elevators) where such information may be heard or seen by others. . . .

"Confidential Information" includes, but is not limited to, any documents, knowledge, data or other information relating to . . . (6) the identity of and compensation paid to the Company's team members, consultants and other agents: . . .

SOLICITATION

Contributions may not be solicited on company property without the permission of the supervisor or Division manager.

DISCIPLINE

EXAMPLES OF VIOLATIONS CAUSING IMMEDIATE TERMINATION
. . . .
• Unauthorized distribution of written or printed matter;
• Unauthorized solicitations or collections;

. . . .

In Respondent MasTec's vernacular, an employee is referred to as a team member. Respondent acknowledged that the same handbook applied at all of its facilities nationwide. There is no evidence of any employee being disciplined under these rules.

Mark Retherford, Respondent MasTec's senior vice president, testified that the handbook had been updated "recently" and that the new handbook was being distributed in the field at the time of the hearing. No other evidence was offered by Respondent MasTec regarding when the handbook was revised or exactly how the revision was communicated to the employees. The confidentiality rule in the new handbook does not include employee compensation in the definition of confidential information and contains the following new language

Of course, the Company recognizes that employees have the right to discuss work-related matters and concerns, including those related to terms and conditions of work.

The updated handbook also contains a new provision governing solicitations, distributions, and use of bulletin boards which appears on its face to comply with Board precedent regarding such rules. In any event, the General Counsel does not allege that the new provision is unlawful.

In determining whether an employer's mere maintenance of a work rule violates the Act, the Board considers whether the rule would reasonably tend to chill employees in the exercise of their Section 7 rights. In making this determination, the Board gives the rule a reasonable reading and refrains from reading particular phrases in isolation. *Albertson's, Inc.,* 351 NLRB 254, 259 (2007), and cases cited therein. Under the test adopted by the Board in *Lutheran Heritage Village-Livonia,* 343 NLRB 646 (2004), the Board first asks "whether the rule *explicitly* restricts activities protected by Section 7." (Emphasis in original.) If so, the rule is unlawful. If it does not explicitly restrict protected activities,

The violation is dependent upon a showing of one of the following: (1) employees would reasonably construe the language to prohibit Section 7 activity; (2) the rule was promulgated in response to union activity; or (3) the rule has been applied to restrict the exercise of Section 7 rights.

Id. at 647. Accord: *Albertson's, Inc.,* supra.

Respondent MasTec's confidentiality rule, at least as it existed in March 2006, clearly violates the Act under this test. The rule explicitly includes information such as employee names and compensation within the definition of confidential information. The Board has long held that an employer may not restrict employees in sharing such information as such discussions among employees are usually a precursor to protected organizational activity. See *Jeannette Corp.,* 217 NLRB 653 (1975), enfd. 532 F.2d 916 (3d Cir. 1976). Accord: *Fredericksburg Glass & Mirror, Inc.,* 323 NLRB 165 (1997). It is immaterial that Respondent MasTec may not have disciplined any employee under this rule for disclosing such information. The mere maintenance of such a rule would reasonably tend to chill employees in the exercise of their right to discuss their wages and working conditions. *Lafayette Park Hotel,* 326 NLRB 824, 825 (1998).

Respondent MasTec's solicitation and distribution rules are overly broad under current Board law because they would restrict employees from engaging in protected solicitation anywhere on company property, regardless of whether the employee was on worktime or in a work area, and would subject employees to possible termination if they engaged in solicitation without permission. Similarly, employees would be subject to possible termination if they engaged in distribution of protected material without permission regardless of the site of the distribution and their work status. These rules, as they existed in March 2006, clearly violate Section 8(a)(1) of the Act. See *Republic Aviation Corp. v. NLRB,* 324 U.S. 793 (1945); *Our Way, Inc.,* 268 NLRB 394 (1983); See also *Tele Tech Holdings, Inc.,* 333 NLRB 402, 403 (2001) (any rule that requires employees to secure permission from their employer before engaging in protected concerted activity at an appropriate time and place is unlawful).

Respondent MasTec essentially concedes that the above quoted rules were unlawful. It failed to make any argument in its brief in opposition to the General Counsel other than to rely upon the putative revision of the rules and the apparent legality of the current rules. However, in the absence of specific evidence showing that the new rule was in fact communicated to the affected employees, or that they were informed that the old

116                              DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

rules were being rescinded and that employees would now be free to engage in protected activity at the appropriate times and places, I can not find that Respondent MasTec has effectively repudiated the unlawful rules. *Passavant Memorial Area Hospital*, 237 NLRB 138 (1978). See also *Claremont Resort & Spa*, 344 NLRB 832 (2005). Accordingly, I find that Respondent MasTec violated Section 8(a)(1) of the Act, as alleged in the complaint, by maintaining the confidentiality rule and the overly broad solicitation and distribution rules in its employee handbook.

### B. The Termination of the 26 Employees

#### 1. The evidence

Respondent MasTec is an "infrastructure company" in the utility, telecommunications, and power energy fields. Its Advanced Technologies Division, involved in this proceeding, is focused on installing, upgrading, and servicing satellite television systems sold by entities such as Respondent DirecTV. Respondent MasTec is one of Respondent DirecTV's "home service providers," or HSPs, and accounts for approximately 30 percent of DirecTV's installations and upgrades. Each HSP is assigned a geographic territory where it performs installation and service exclusively for DirecTV. The HSP involved in this proceeding is in the Orlando, Florida area. In 2006, Respondent MasTec employed over 100 technicians in the Orlando facility who worked exclusively on DirecTV products. Herbert Villa, Respondent MasTec's senior technical supervisor, was responsible for day-to-day supervision of these technicians. He reported to Christopher Brown, who was Respondent MasTec's operations manager for North Florida. Brown in turn reported to Mark Retherford, Respondent MasTec's senior vice president responsible for the DirecTV business. Steven Crawford is Respondent DirecTV's vice president of field operations responsible for overseeing the activities of the HSPs, including Respondent MasTec.

The relationship between the Respondents is governed by a contract, or Home Service Provider Agreement. The 2005 Agreement, which was in effect during the relevant period here, prohibits Respondent MasTec from working for any other satellite television provider. Under this agreement, Respondent MasTec is paid by Respondent DirecTV for each satellite TV installation in its territory, regardless of whether the service was ordered through Respondent DirecTV or through a third party retailer, such as Direct Star TV. The initial installation includes, per contract, connection of an active telephone line from the customer's home to the satellite TV receiver and part of the fee paid by Respondent DirecTV to Respondent MasTec is for this connection. The customer is not charged for a routine telephone line connection. The 2005 HSP Agreement also contains penalties if MasTec or any other HSP fails to meet performance standards, including removal of territory. The record contains evidence that Respondent DirecTV in fact exercised this option in 2004 by removing territory from MasTec in New Jersey. The contract requires Respondent MasTec employees to wear DirecTV uniforms and drive vehicles bearing the DirecTV logo. However, Respondent DirecTV is not involved in the hiring or day-to-day supervision of Respondent MasTec's employees. Respondent MasTec is solely responsible for de-

termining the wages and benefits provided to technicians it hires to service this contract.

The 100 or so technicians who worked out of Respondent MasTec's Orlando office were divided into seven teams, each reporting to a supervisor, who held weekly team meetings. As noted above, Villa was in charge of the Orlando office. In addition to the weekly team meetings, Respondent MasTec conducted training, both initially when a technician was hired, and periodically thereafter, to remind employees of the requirements of the job or to introduce new methods or procedures. All employees were also given training materials when hired and throughout their employment, including periodic "Tech Tips" prepared by Respondent DirecTV, and each technician carried in his or her vehicle Respondent DirecTV's "Standard Professional Installation Guidelines." It is undisputed that all of the training and the materials distributed to the technicians regularly reminded them of the importance of connecting phone lines to receivers as part of the installation process.[4]

Respondent MasTec's Orlando technicians typically report to the Orlando facility each day at 7 a.m. to pick up their route assignments for the day and any equipment they will need to complete the assignments on the schedule.[5] The assignments are designated as either "A.M." or "P.M." based on when the customer has been told the technician would be there. The A.M. assignments are expected to be done between 8 a.m. and 12 noon. The P.M. assignments are to be done between 1 and 5 p.m. When a technician arrives at the customer's home, he or she will review the order with the customer, determine with the customer where is the best place to locate the satellite dish, and discuss the location of the televisions to be connected to the receiver. The technician is also expected to review the installation procedure, including the telephone line connection, answering any questions the customer has regarding this. Once the installation is complete and the receiver is connected, the technician calls DirecTV to activate the receiver and verify the signal. He or she will then educate the customer on how to use the product. These procedures are spelled out in the "Statement of Work" contained in the HSP Agreement. Technicians are paid piecemeal by the job, based on the type and size of the job. As a result, the more installations a technician is able to complete in a day, the higher his pay.

There was a great deal of testimony regarding the telephone connection part of an installation. It is clear that this is vitally important to Respondent DirecTV and, by extension Respondent MasTec. A receiver that is connected to an active telephone line is called a "responder" while those that are not connected are called "non-responders." There is no dispute that a receiver does not need to be connected to an active telephone line in order for a customer to receive a satellite signal. Rather, ac-

---

[4] In fact, virtually all of the training materials in evidence refer to connection of telephone lines as a mandatory part of the technician's installation procedures.

[5] Some of Respondent MasTec's technicians, such as Rudy Rodriguez who testified at the hearing, receive their assignments via fax at home because of the distance they live from the office. These technicians still are required to come in for the weekly team meetings and also, from time to time, to replenish equipment they carry in their vans.

MASTEC ADVANCED TECHNOLOGIES

cording to the Respondents' witnesses, it is a convenience feature which allows a customer to order pay-per-view broadcasts via remote control, to have caller ID displayed on the television screen, and to receive downloads from DirecTV of software upgrades. Of course the telephone connection also allows DirecTV to track the programs that its customers watch, information which DirecTV may use to determine programming, etc.

As previously noted above, there is no separate charge to the customer for a standard telephone line connection. However, if a customer does not want exposed telephone lines running across the room or along the baseboard, they can opt for a custom installation, such as a "wall fish," in which the technician will "fish" behind the wall to run the telephone wire to the satellite receiver. Another option is a wireless telephone jack. Customers who choose these options are charged $52.50 for a "wall fish" and $49 for a wireless jack. These charges are determined by Respondent MasTec, not Respondent DirecTV.

There is no dispute that technicians are not always able to connect a receiver to an active telephone line. For example, some customers have opted to forego a land line for their telephone service, relying exclusively on cell phones for their telecommunications. In these situations, there are no live telephone lines in the home to connect. In other situations, customers will refuse to have telephone lines connected because they do not want the exposed lines and are unwilling to pay extra for a "wall fish" or wireless jack. There are also customers who will refuse to connect a telephone line to the receiver because they do not want to enable their children to order pay-per-view via the remote. Finally, there are some customers who simply do not want to give DirecTV access to the information that could be conveyed via their telephone lines. There is also undisputed evidence that some customers who allow the technician to connect the telephone line will unplug it after the technician leaves the home. In all of these situations, the receiver will be counted as a "non-responder."

In early 2006, Respondent MasTec was Respondent DirecTV's worst performing HSP in terms of active responder rates on telephone lines. According to witnesses for the Respondents, Respondent DirecTV decided to penalize Respondent MasTec in an effort to get it to improve its responder rate. Beginning in the first quarter of 2006, Respondent DirecTV back charged Respondent MasTec at the rate of $5 for each non-responder if its non-responder rate exceeded 47 percent in a month. In order to avoid this penalty, Respondent MasTec had to connect at least 53 percent of the receivers it installed to active telephone lines. It was in response to this move by Respondent DirecTV that Respondent MasTec implemented the policy that became the subject of controversy among its employees in Orlando.

On January 17, Respondent MasTec informed its technicians, by memo, that it was changing its pay structure in order to encourage employees to improve their performance in terms of telephone connections. Under the new pay structure, which was to be effective February 1, Respondent MasTec would reduce the amount paid on each installation by $2 and the amount paid on each additional outlet by $2 and would instead pay $3.35 for each responding, i.e. connected, receiver. The memo also informed employees that Respondent MasTec was establishing a minimum threshold of 50-percent responders per 30-day period. If a technician failed to meet this threshold, i.e., failed to connect active telephone lines to receivers in 50 percent of his installations, then his pay would be reduced by $5 per non-responding receiver biweekly. If a technician failed to meet the 50-percent threshold for a consecutive 60-day period, he would be subject to termination. The memo concluded by illustrating through several hypothetical employees how, under the new pay structure, a technician could earn more than he was currently making if he increased his responder rate.

There is no dispute that Respondent MasTec communicated this policy not only in the January 17 memo but by having its supervisors discuss it with the employees at weekly team meetings after the memo came out. Christopher Brown, the operations manager for North Florida, also spoke to employees at the team meetings about the new policy. Several technicians testified as witnesses for the General Counsel about these meetings. Their testimony establishes that the technicians resisted the change from the start, speaking up at each meeting about the difficulty in achieving the 50-percent threshold due to factors beyond the technician's control. Frequently cited by the employees was the problem with customers who did not have land line telephones and customers who adamantly refused a telephone connection. Some technicians complained that even after connecting the phone line, the customer could disconnect it. According to these witnesses, Respondent MasTec's supervisors brushed off the employees' concerns, advising the technicians to tell the customer whatever was necessary to make a connection, even if that meant lying to a customer. Several witnesses recalled supervisors instructing them to simply connect the phone line without telling the customer, or to hardwire the telephone jack into the wall so the customer could not disconnect it after they left. At least one supervisor told the technicians to tell the customer the receiver wouldn't work without the phone line connected. Respondent's witnesses conceded that this latter statement was not true. Several witnesses testified that, at one meeting, Operations Manager Christopher Brown told the technicians to do whatever they could to convince the customer, to say anything, even that the box (receiver) would blow up if not connected to the phone line. Several of General Counsel's witnesses admitted they laughed at this statement and believed Brown was joking.

Christopher Brown admitted making the statement about the box blowing up if not connected to a phone line but claims he said this in order to add some "comic relief during a tense meeting which appeared to be going nowhere. According to Brown, at every meeting the technicians brought up the same excuses why they could not make the 50-percent threshold and at each meeting he, Villa and the supervisors attempted to explain how they could. Brown and Villa both testified that they offered suggestions to the employees about ways to convince a customer of the benefits of a telephone connection but continued to hear the same complaints. Brown resorted to his "comic relief only out of frustration with the lack of progress in convincing the employees of the need to improve their responder

118                                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

rates. While not disputing much of the testimony of General Counsel's witnesses, Brown and Villa, insisted that they never told the technicians to "lie" to a customer, or to do "whatever it takes," to accomplish the goal of connecting phone lines.[6]

Although there is no evidence that Respondent DirecTV required Respondent MasTec to adopt the new pay structure, it participated in the effort to get the technicians to increase their responder rates by distributing a training video on the subject of phone lines. This video, which Respondent MasTec showed to its Orlando employees in February or March, after the change in pay structure was announced, featured Respondent DirecTV Vice Presidents Steven Crawford and Scott Brown. In the video, Crawford states that technicians should not blame their manager, supervisor, or employer for the increased emphasis on phone lines because he was the one putting pressure on them to get it done. Crawford also offered suggestions to technicians on how to get the phone lines connected, including doing so without telling the customer, or by telling the customer such a connection was "mandatory." There is no dispute that, while a telephone connection is mandatory for HSPs and the technicians employed by them, it is not mandatory for the customer.

On March 17, Respondent MasTec informed the technicians, by memo, that the new pay structure, including the $5 per non-responder chargeback, was going into effect and that the first paychecks reflecting this would be issued on March 24. The Monday after employees received their first paychecks reflecting chargebacks, i.e., March 27, a large group of technicians gathered in the parking lot outside the Orlando facility before work to complain about the new pay structure. Senior Supervisor Villa came outside to talk to them. There is no dispute that the technicians were upset and angry and voiced many of the same concerns they had expressed in team meetings and individually in the weeks preceding implementation of the new pay structure. Villa testified that he was subjected to name calling and profanity. Nevertheless he tried for about an hour to calm the group and get then to return to work. After about an hour, Chris Brown, who had been called by Villa and informed of the uprising, arrived at the facility and also spoke to the technicians in the parking lot. Both Brown and Villa tried to point out to the technicians that some of the them had actually earned more money under the new system, suggesting that if all of them worked at connecting more telephone lines they would not have to worry about losing money. One employee who testified, Delroy Harrison, had been backcharged $405 and demanded that Brown reimburse him. Harrison was with another technician, Hugh Fowler, who had made money and Brown pointed this out to Harrison.

After getting nowhere with the technicians, Brown went into the office and spoke to his boss, Gus Rey. He returned to the parking lot and told several of the technicians that he would look into their complaints. According to Brown, when he looked at the pay stubs of some of the complaining technicians, they "looked kind of weird." Brown promised to investigate and make sure that the new structure had been applied properly.

He promised to have an answer the following day. Brown also promised the technicians that he would devise a way to track the technicians responder rate in the field to help them in meeting the threshold. All witnesses agree that, at some point, Brown climbed on top of a van and told the technicians it was time to get back to work. After this, the technicians began to disperse and leave for their morning appointments. Brown testified that it was about 11 a.m. when this happened, 3 hours after technicians are supposed to be at their first appointment.[7]

Harrison testified that, before leaving, he spoke individually with Chris Brown. According to Harrison, he told Brown that what the Company was doing was not right. Brown responded by telling Harrison that he had replacements for all of them. Harrison ended the conversation by telling Brown that things were going to change because what they, i.e., the Company, was doing was not right. According to Harrison, no one else witnessed this conversation.[8] Brown's version of this conversation is more detailed. According to Brown, Harrison showed him his work orders for the day and said that if he went to a job with five receivers and he couldn't connect the phone lines, he would cancel the job. Brown testified that he expressed surprise that Harrison would throw away what he could earn on such a job simply because it would count against him on his responder rate. Later in the conversation, Brown said to Harrison

> You know what? If there's a part of my job I don't want to do, and I just refuse to do, there's someone else, there's a replacement ready to take my job, and will gladly do everything that needs to be done for my job. I can be replaced, you can be replaced [referring to the tech], we can all be replaced if we don't want to do our jobs.

There is no dispute that Harrison did his route that day and did not refuse to do any installations.

The technicians gathered in the parking lot again the next day, i.e., March 28. As promised, Brown met with the technicians and distributed the "tracking" sheet he had developed. He also provided answers to some of the individual complaints he had investigated. All of the witnesses who testified about this second day agreed that the exchange was much the same as the day before, i.e., the technicians still complaining, essentially, that they should not be held responsible for non-responders because of circumstances beyond their control and Brown telling them that this is the way it's going to be and to just do it. It was also agreed that this gathering did not last as long as the previous day. After a while, Brown told the employees it was time to get to work and they began to disperse. Harrison alone testified that Brown told the technicians that, if they did not want to work, they could leave and if they did not leave it would force him to do what he didn't want to do. Harrison recalled that Brown then turned to one of the supervisors, Mike Cuzon, and told him not to let this happen again, that if any technicians had a complaint, they should see him individually.

[6] Delroy Harrison, one of General Counsel's witnesses, conceded on cross-examination that none of Respondent MasTec's supervisors ever specifically told the technicians to "lie" to a customer.

[7] General Counsel's witnesses did not dispute the testimony that many of the technicians did not leave to begin their routes until 11 a.m.

[8] Harrison's testimony is the basis for the complaint allegation that Respondent MasTec threatened employees with discharge if they concertedly complained about their wages.

MASTEC ADVANCED TECHNOLOGIES

Harrison spoke up, telling Brown that the employees wanted to speak as a group, not individually.[9] Guest, who also testified about the Tuesday gathering, did not corroborate this testimony. Fowler testified that Brown told the employees if they did not want to do their jobs he had replacements for them. According to Fowler, Brown went on to say that "this is a business, not a family." Brown denied saying, "don't make me do what I don't want to do." Rather, he claims he told the technicians that they needed to get to their jobs before they started missing appointments and worse things happened. There is no dispute that none of the technicians who gathered in the parking lot on Monday and Tuesday were disciplined for their participation in this group protest.

After the two parking lot protests, still unhappy with Respondent MasTec's new pay structure and believing that their concerns were not being addressed, several of the technicians began discussing ways to go public with their dispute. Guest testified that it was technician Frank Martinez who suggested they contact the media.[10] Guest was corroborated by Fowler and Harrison. According to Harrison, the employees hoped the media spotlight might put pressure on Respondent MasTec to abandon the new policy of charging back employees for non-responders. Although several media outlets were contacted, only one expressed an interest in their story, WKMG-TV Local 6 (referred to here as Channel 6). According to General Counsel's witnesses, it was Martinez who set up the appointment with Nancy Alvarez, a reporter from Channel 6, so employees could tell her about the new policy. There is no dispute that, on March 30, the 27 technicians named in the original complaint, along with Martinez, went to the TV station to meet with Alvarez. There is also no dispute that the technicians drove to the station in their DirecTV vans, wearing their DirecTV uniforms. Most of the technicians drove to the station from Respondent MasTec's offices before starting their assignments for the clay.

The General Counsel's witnesses testified that no specific plan to wear their uniforms and drive together in their work vans had been discussed before the meeting at the TV station. According to these witnesses, the apparent caravan and similarity in appearance were merely coincidental. The employee witnesses also denied that they had agreed in advance to designate anyone as their spokesperson, or that they had planned what to say. However, once they got to the TV station, Martinez assumed the role of spokesperson and did most of the talking with Alvarez. After initially talking to Martinez and a few others, Alvarez invited all the technicians who were there into the station where she interviewed them as a group while filming the exchange. According to the General Counsel's witnesses, it was Alvarez who determined which technicians to interview and what statements to highlight in her report. The employees left the TV station at approximately 9:45 a.m., at which point they resumed their work assignments.

Christopher Brown testified that he was informed that tech-

nicians were in the parking lot of Channel 6. He admitted that he and Villa drove by the TV station and confirmed this. When they arrived, the technicians were leaving in their vans. There is no evidence, nor allegation, that either Brown, or any other Respondent MasTec supervisor, questioned any of the technicians about their visit to the TV station or took any action against them before the broadcast of the report made from these interviews. Both Respondents were contacted by Alvarez after she met with the technicians and asked for a response to accusations made by the technicians, including a claim that they had been told to lie to customers. Rather than agreeing to be interviewed, each Respondent submitted a written statement to the TV station. Respondent DirecTV's director of public relations Robert Mercer, sent the following statement to Alvarez on April 21 via email

> We fully endorse MasTec's plan to provide incentives for technicians to install the required phone line connections so our customers can enjoy the full complement of DIRECTV services. We believe it's fair and offers technicians, who properly perform their installation work, an opportunity to make more money. DIRECTV pays for the installation of a phone line and we advertise it as part of our service. Technicians who don't make that connection are denying our customers the full benefit and function of their DIRECTV System, and as a result, we're not fulfilling our promise to the customer, and that's an issue we take quite seriously.

Respondent MasTec's written statement, while also emphasizing the benefit of a telephone connection to the customer, also explained in detail how the charge back policy worked and how a technician could benefit from it.

Channel 6 first aired its broadcast of the technicians' complaints on May 1, during the 5 p.m. newscast.[11] The broadcast was preceded by an advertisement, called a "teaser," about the upcoming news report, which appeared on Friday, April 28. The teaser opened with a reporter asking, "Why did over 30 employees of a major company show up at Local 6?," followed by video of the following exchange between the reporter and one of the technicians

> INTERVIEWER: So you've basically been told to lie to customers?
>
> TECHNICIAN: Yeah.

A voice over then intones, in response to the first question, "to tell the Problem Solvers about a dirty little secret." This is followed by video of the technician saying, "Tell the customer whatever you have to tell them." The teaser continues with the reporter saying, "That may be costing you money."

The full news story which aired on May 1, is as follows

> NEWS ANCHOR 1: Only on 6 . . . a problem solver investigation with a bit of a twist . . . this time they came to us.

---

[9] This testimony by Harrison is also relied upon by the General Counsel as the basis for the allegation that Respondent MasTec threatened employees with discharge.

[10] Martinez, who resigned and was not named as a discriminatee, did not testify at the hearing.

[11] Video of all of the broadcasts and teaser ads are in evidence along with transcripts prepared by the parties.

120                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

NEW ANCHOR 2: Yeah . . . technicians who have installed hundreds of DirecTV satellite systems across Central Florida . . . they're talking about a company policy that charges you for something you may not ever use. And as problem solver Nancy Alvarez found, if you don't pay for it, the workers do.

REPORTER ALVAREZ: They arrived at our Local 6 studios in droves. DirecTV trucks packed the parking lot and inside the technicians spoke their minds. (accompanying video showed more than 16 DirecTV vans in the parking lot followed by a shot panning a group of technicians wearing shirts bearing the DirecTV logo).

TECHNICIAN LEE SELBY:[12] We're just asking to be treated fairly.

ALVAREZ: These men have installed hundreds of DirecTV systems in homes across Central Florida but now they admit they've lied to customers along the way.

HUGH FOWLER:[13] If we don't lie to the customers, we get back charged for it. And you can't make money.

ALVAREZ: We'll explain the lies later but first the truth. Phone lines are not necessary for a DirecTV system; having them only enhances the service allowing customers to order movies through a remote control instead of through the phone or over the internet.

ALVAREZ: So it's a convenience . . .

TECHNICIAN MARTINEZ:[14] It's more of a convenience than anything else . . .

ALVAREZ: But every phone line connected to a receiver means more money for DirecTV and MasTec, the contractor these men work for. So the techs say their supervisors have been putting pressure on them. Deducting five bucks from their paychecks for every DirecTV receiver that's not connected to a phone line.

MARTINEZ: We go to a home that...that needs three . . . three receivers that's . . . fifteen dollars.

ALVAREZ: Throw in dozens of homes every week and the losses are adding up fast.

ALVAREZ (questioning a room full of technicians): How many of you here by a show of hands have had $200.00 taken out of you paycheck? (accompanying video showed virtually every technician in the room raising hand).

MARTINEZ: More.

ALVAREZ (reporting): Want to avoid a deduction on your paycheck? Well, according to this group, supervisors have ordered them to do or say whatever it takes.

MARTINEZ: Tell the customer whatever you have to tell them. Tell them if these phone lines are not connected the receiver will blow up.

ALVAREZ (interviewing): You've been told to tell customers that. . . .

MARTINEZ: We've been told to say that. Whatever it takes to get the phone line into that receiver.

ALVAREZ (reporting): That lie could cost customers big money . . . the fee to have a phone line installed could be as high as $52.00 per room . . . want a wireless phone jack? That will cost you another 50 bucks.

ALVAREZ (shown outside Respondent's Orlando office attempting to speak to Villa): We're hoping to talk to you guys about some concerns raised by your employees . . .

VILLA: Sorry . . . guys, I need you to walk out of the office; this is a private office.

ALVAREZ (reporting): The bosses at MasTec's Orlando office did not want to comment.

ALVAREZ (seen attempting to interview Villa): We have employees saying that you asked them to lie . . .

VILLA: Please . . thank you . . .

ALVAREZ: . . . to customers. Is that true? (this exchange while video shows Alvarez and camera crew being ushered out of the office).

ALVAREZ (again in reporting mode): But statements from their corporate office and from DirecTV make it clear the policy of deducting money from employees' paychecks will continue. A DirecTV spokesman said techs who don't hook up phone lines are quote 'denying customers the full benefit and function of their DirecTV system.' These men disagree and say the policy has done nothing but create an environment where lying to customers is part of the job.

ALVAREZ (interviewing): It's either lie or lose money.

TECHNICIAN SEBASTIAN ERISTE:[15] We don't have a choice.

ALVAREZ (reporting): Now . . . During our investigation, MasTec decided to reimburse money to some techs who had met a certain quota but the policy continues and one reason could be that DirecTV does keep track of their customers' viewing habits through those phone lines. Now just last year, DirecTV paid out a $5 million settlement with Florida and 21 other states for deceptive practices and now, because of our story, the attorney general's office is looking into this newest issue so we'll, of course, keep you posted.

NEWS ANCHOR 2: You think they would have learned the first time.

ALVAREZ: You think so. We'll see what happens.

NEWS ANCHOR 2: Thank you, Nancy.

This report aired several more times over a 2-day period, in slightly different versions but with the same theme. Employees Guest and Fowler testified that they did not see the broadcast before it was aired, that Alvarez did not review with them the content of the report and that the only input they had was their appearance at the station and the responses to Alvarez' questions.

Christopher Brown, Respondent MasTec's operations manager, testified he first became aware of the broadcast when he saw a "teaser ad" for the upcoming newscast. He called his

---

[12] Selby is not an alleged discriminatee in this case, having resigned before the terminations at issue.

[13] Fowler is one of the alleged discriminatees who testified at the hearing.

[14] As previously noted, Martinez resigned before the broadcast.

[15] Eriste is one of the alleged discriminatees.

MASTEC ADVANCED TECHNOLOGIES

boss, Rey, and Respondent MasTec's vice president, Retherford, to alert them about the news story. According to Brown, he was instructed to record the teaser and any broadcast about Respondents. Brown did so and converted the recordings to computer files which he e mailed to his superiors. Retherford testified that he saw the initial broadcast, as well as subsequent reports aired on May 2 and 3. Retherford provided Respondent DirecTV's vice president, Crawford, and Public Relations Director Mercer web links to the broadcast. Retherford admitted being "shocked" by the report, especially by what he characterized as the "flippant" attitude of the technicians about lying to customers. Retherford and Crawford admitted that they discussed the broadcast and their concerns about the negative light it casts on DirecTV. It is undisputed that Crawford told Retherford that he did not want any of the technicians who appeared in the broadcast representing DirecTV in customers homes. A series of emails between Crawford and Retherford on May 1 and 2 establishes that Respondent DirecTV was concerned about these technicians continuing to work on DirecTV installations after they were shown on TV saying they had been lying to customers and refusing to do phone lines. It is apparent that Respondent DirecTV was eager to have Respondent MasTec take action against the technicians involved in the broadcast.[16]

Following his conversations with Crawford, Retherford directed Christopher Brown to determine which technicians appeared in the broadcast. Brown and Villa reviewed the broadcast several times to identify all of the technicians. Brown then sent Retherford a list of the technicians. Retherford testified that, on the afternoon of May 2, he made the decision to terminate all the technicians who were shown in the broadcast after receiving the information from Brown and discussing it with Brown and Rey. It is undisputed that this decision was made without any further investigation and without interviewing the employees involved. It is clear that Retherford, in reaching this decision, did not seek to differentiate the technicians based on whether they were quoted on the broadcast. Nor did he consider each technicians individual degree of participation in the report. Retherford testified that he made this decision because he believed the technicians who had appeared on television had impaired Respondent MasTec's relationship with Respondent DirecTV. He testified that the technicians had misrepresented the product by stating that telephone lines were only a convenience and by saying they had been told to lie to customers. Retherford testified further that statements indicating that every technician had been charged for failing to connect phone lines was a misrepresentation. Other misrepresentations identified by Retherford were statements that technicians were being charged $5 for every receiver not connected and that Respondent MasTec made money on telephone connections. Respondents offered evidence at the hearing that, after the news story aired, they each received telephone calls from customers asking to cancel their DirecTV service.

After making his decision, Retherford called Christopher Brown and told him that all of the technicians who appeared in

the broadcast were to be discharged. Retherford instructed Brown to have Villa tell the technicians they were being discharged "at will." Villa was not to give any other reason for the discharge. On Wednesday morning, May 3, Villa instructed the supervisors to call the technicians who were to be terminated and tell them to come into the office after they finished their routes. As each technician came in, Villa told him he was being terminated "at will" and asked him to return the keys to his vehicle, gas card, and cell phone. If an employee asked why he was being terminated, Villa would only repeat that they were being terminated "at will." Even when some technicians asked if they were being terminated because of the broadcast, Villa responded only that they were terminated "at will." The only technicians not terminated on May 3 were those who were on vacation. Those technicians who were on vacation, with one exception, were terminated before they returned. Tuckfield who was also on vacation was not terminated. Instead, according to Brown, he was retained because of concerns about getting the work done with so much of the workforce terminated. Brown and Rey made the decision not to terminate Tuckfield without consulting with Retherford.[17]

Ricardo Perlaza, one of the technicians who appeared in the Channel 6 broadcast, testified that he received a telephone call from his supervisor, Noel Muniz, on May 2, before anyone was terminated. Perlaza testified that Muniz asked him if he had anything to do with the news story. When Perlaza said he had, Muniz asked him why. Perlaza explained that he did not agree with what was going on and did not like the charge back policy. According to Perlaza, Muniz responded by telling Perlaza that he "was not supposed to do that." Muniz then asked Perlaza if he knew what had happened in New Jersey. When Perlaza said he did not, Muniz told him the employees there tried the same thing and Respondent MasTec closed the facility. At the end of the conversation, Muniz told Perlaza he should call Chris Brown and apologize and tell Brown he did not know the consequences of going to the TV station. Muniz said if Perlaza did not do this, there would be a lot of trouble for everybody. Muniz, while not specifically denying that he had a conversation with Perlaza on May 2, denied ever speaking to Perlaza about a MasTec facility in New Jersey. In fact, Muniz denied having any knowledge of such a facility at the time he spoke to Perlaza, and specifically denied telling Perlaza that the facility in New Jersey had closed because employees there complained about working conditions.[18]

---

[16] For example, in one email, Crawford asks Retherford, "of the 30 or so techs on the show are they still employed?"

[17] Fowler was on a 3-week assignment working in the Atlanta area when he was called and told to return to Orlando. Although his supervisor would not give him a reason, Fowler learned from other technicians while driving back from Atlanta that they had been terminated. By the time he got to Gainesville, his company cell phone had been turned off. Fowler did not report to the office when he returned to Orlando and learned that all the other technicians had been fired. Respondent MasTec eventually picked up the truck from his home.

[18] In a pretrial affidavit Muniz gave to the Board's Regional Office, he admitted having a conversation with another former employee who told him that the New Jersey facility had closed. Muniz explained at the hearing that this conversation occurred after he spoke to Perlaza.

### 2.  Alleged 8(a)(1) threats

The complaint alleges, at paragraph 8, that Respondent MasTec, through Christopher Brown, violated Section 8(a)(1) of the Act in late March by threatening to discharge employees if they concertedly complained about their wages. As noted above, the General Counsel relies upon the testimony of Harrison and Fowler regarding two statements allegedly made by Brown during the two group protests in the parking lot on March 27 and 28. The first involves Harrison's testimony that Brown told him that he had replacements for all of them. This statement was made after Harrison told Brown that what Respondent MasTec was doing to the technicians wasn't right. Although Brown admitted telling Harrison that he could be replaced, he placed this comment in the context of a conversation with Harrison over Harrison's refusing to do any installation where he could not connect the phone lines. As described by Brown, this attempt at self help by Harrison amounted to a refusal to perform assigned work. Thus, in his version of the conversation, he was simply telling Harrison that if he refused to do the work, someone else could be hired to replace him who would do whatever was asked.

Because there are no other witnesses to this conversation, I must first determine which of these two witnesses is more credible. As between Harrison and Brown, I find that Brown's more detailed recollection of the conversation is more credible than the isolated comment in Harrison's version. I reaching this conclusion, I note that Harrison's testimony in general was marked by inconsistencies both internally and as between his testimony and his pretrial affidavit. His demeanor also conveyed hostility toward Respondents which may have colored his recollection of the events. In addition, the alleged threat to replace all the technicians makes no sense out of context. I note that this threat was allegedly made after Brown and Villa had spent several hours listening to the employees' complaints and attempting to answer their questions, and after Brown had asked the employees several times to return to work. Rather than a threat to discharge the employees for exercising their right to engage in concerted activity, I find that Brown was simply telling Harrison that, if he did not want to do his job, there were others who would be willing to do it and he, Harrison, could be replaced. This statement was made only after Harrison told Brown that he would not do an installation if he went to a job where he could not connect the phone lines.[19]

The General Counsel also cites Fowler's testimony that Brown told the employees in the parking lot on the second day that if they did not want to do their jobs, he had replacements for them. Although Fowler testified that Brown made this statement to a group of employees, no one corroborated his testimony. In the absence of corroboration, I can not credit this testimony. Even assuming Brown made this statement, I would not find that it was a threat to discharge employees for engag-

ing in protected activity. At most, it was a statement that employees who refused to do their jobs could be replaced.

Based on my credibility resolutions, I find that General Counsel has not met his burden of proving that Respondent violated Section 8(a)(1) through any statements made by Brown on March 27 and 28. Accordingly, I shall recommend dismissal of paragraph 8 of the complaint.

The complaint alleges at paragraph 9(b) that Respondent violated Section 8(a)(1) of the Act, during Muniz' telephone conversation with Perlaza on May 2, by threatening employees with facility closure and unspecified reprisals because they conceitedly complained about their wages and appealed to third parties.[20] This allegation also turns on credibility. As to this allegation, Perlaza gave the more detailed account of the conversation. Muniz simply denied, in response to leading questions, that he had a conversation with Perlaza about the New Jersey facility and that he made the alleged threat. Yet, on cross-examination, he conceded that he was aware of Respondent MasTec closing a facility in New Jersey. His explanation for this discrepancy, that he did not learn about the New Jersey facility until after speaking to Perlaza, is dubious. I thus credit Perlaza's testimony. Based on that testimony, I find that Muniz told Perlaza that Respondent MasTec had closed a facility in New Jersey when employees "tried the same thing," referring to the Orlando employees participation in the news story. The implication in this statement is that Respondent MasTec would do the dame thing in Orlando. That is why Muniz suggested to Perlaza that he apologize to Brown because, if he didn't, "there would be a lot of trouble for everybody." Because these statements, under all the circumstances, would reasonably tend to interfere with, restrain, and coerce employees in the exercise of their Section 7 rights, I find that Respondent violated Section 8(a)(1) of the Act, as alleged in paragraph 9(b) of the complaint. *Grouse Mountain Lodge*, 333 NLRB 1322, 1324–1325 (2001), quoting from *American Freightways Co.*, 124 NLRB 146 (1959).

### 3.  Alleged termination of employees for engaging in protected concerted activities

The complaint alleges that the technicians employed by Respondent MasTec were engaged in concerted activities protected by Section 7 of the Act during the period from January through March when they protested their employer's new pay structure, which included the chargeback provision for non-responding receivers. This protected activity is alleged to include objections to the new policy voiced by technicians at team meetings as well as the group protests in the parking lot on March 27 and 28 when they confronted Villa and Chris Brown after the first paychecks with chargebacks had been issued. The complaint alleges that the employees' protected concerted activity continued on March 30 when a number of them went to the studios of Channel 6 to air their dispute publicly and enlist the support of the local news program. The General Counsel further alleges that Respondent DirecTV caused Respondent MasTec to discharge 26 of the employees and that MasTec in fact discharged them in early May because

---

[19] I also do not credit Harrison's uncorroborated testimony that Brown told the employees the following day, when they refused to leave the parking lot to start their assignments, "don't make me do what I don't want to do." Even assuming Brown made this statement, it was in response to the employees' refusal to work, not their protected concerted activity.

[20] The General Counsel withdrew complaint par. 9(a).

they engaged in this protected concerted activity.

Respondents do not dispute the concerted nature of the employees activity. It also appears that, with the exception of the visit to the TV station, the Respondents also do not challenge the protected nature of this concerted activity. Although Respondent MasTec, in a footnote in its brief, appears to suggest that those employees who used profanity during the parking lot protests or refused to go to work when requested to do so by Chris Brown during that protest, may have exceeded the bounds of protected conduct, it does not argue for dismissal of the complaint on that basis. In any event, there is no evidence here that Respondent MasTec discharged any of the employees who participated in the parking lot protest for using profanity or being insubordinate. In fact, both Respondents argue that Respondent MasTec's choice not to discipline any of the employees after these incidents establishes that it was not motivated by any "protected" concerted activity in terminating the 26 employees whose status is in dispute. It is clear from the evidence in the record that the sole reason Respondent MasTec terminated the employees was their appearance in the Channel 6 news report that aired on May 1 and that, had the employees not gone to the media with their complaints, they would not have been terminated for the other conduct they engaged in before March 30.

With respect to the allegation that Respondent DirecTV caused Respondent MasTec to terminate the 26 employees, I agree with the General Counsel that the evidence in the record clearly supports this allegation. Although Respondent DirecTV may not have any contractual right to determine whether Respondent MasTec should hire or fire an employee, here the conversations between Retherford and Crawford, as well as the emails exchanged within a day of the first broadcast on May 1, show that Respondent DirecTV expected Respondent MasTec to terminate these employees. Crawford clearly informed Retherford that he did not want any of the employees who appeared in the broadcast to represent DirecTV. Because Respondent MasTec only performed work for Respondent DirecTV, it had no choice but to terminate the employees in response to this statement. Accordingly, I find as alleged in the complaint that Respondent DirecTV attempted to cause and did cause Respondent MasTec to terminate the 26 employees named in the complaint. *Dews Construction Corp.,* 231 NLRB 182 (1977), enfd. 578 F.2d 1374 (3d Cir. 1978).

The only issue remaining is whether, in terminating these employees, Respondents violated Section 8(a)(1) of the Act. Resolution of this issue turns on whether the employees who appeared in the news story broadcast by Channel 6 on May 1 were entitled to the protection of Section 7 of the Act. In the *Jefferson Standard* case, the Supreme Court held that employees engaged in concerted activity lose the Act's protection when they engage in disloyalty to their employer by making disparaging attacks on the quality of the employer's products and services that are unconnected to a labor dispute.[21] Since *Jefferson Standard* was decided, the Board and the courts have recognized that employees have a right to seek support from

outside parties, including the media, as long as their communication with such parties relates to an ongoing labor dispute and is not disloyal, reckless, or maliciously false. *Five Star Transportation, Inc.,* 349 NLRB 42, 45 (2007), and cases cited therein. See also *Endicott Interconnect Technologies, Inc.,* 345 NLRB 448 (2005), enf. denied 453 F.3d 532 (D.C. Cir. 2006); *St. Luke's Episcopal-Presbyterian Hospitals, Inc.,* 331 NLRB 761 (2000), enf. denied 268 F.3d 575 (8th Cir. 2001); *Allied Aviation Service,* 248 NLRB 229 (1980), enfd. 636 F.2d 1210 (3d Cir. 1980). In *Five Star Transportation,* supra, the Board recently described its approach to these cases as follows

> In determining whether employee conduct falls outside the realm of conduct protected by Section 7, we consider whether "the attitude of the employees is flagrantly disloyal, wholly incommensurate with any grievances which they might have, and manifested by public disparagement of the employer's product or undermining its reputation. . . ." [citation omitted]. A critical further determination is whether the conduct bears a "sufficient relation to [employee] wages, hours, and conditions of employment" [citations omitted].

Finally, in *Jefferson Standard,* supra, the Court warned that it is often necessary in these types of cases to identify and recognize those employees engaged in such disloyal conduct separate and apart from other employees who, while engaged in simultaneous protected activity, refrained from joining others who engaged in acts of insubordination, disobedience, or disloyalty. 346 U.S. supra at 474–475.

Applying the law to the facts here, I find initially that the technicians' appeal to the public, through the Channel 6 news story, did relate to an ongoing labor dispute with their employer. The contact with reporter Nancy Alvarez and the visit to the TV station was the culmination of the employees' efforts to get Respondent MasTec to rescind the charge back policy which had just gone into effect. As broadcast on TV, the first employee to appear in the report expressed what the employees were looking for when he said, "We're just asking to be treated fairly." The reporter, in her story, referred to the $5 charge for nonresponders that Respondent MasTec was deducting from the employee's wages and its impact on the employees. At other points in the story she and the employees addressed this particular policy. Any reasonable viewer would understand, watching the story, that the technicians who appeared were concerned about their wages. While the anchors and reporters highlighted the consumer protection aspect of the story, the underlying labor dispute was evident throughout the report. See *Endicott Interconnect Technologies,* supra.[22]

The more difficult issue here is whether the remarks broadcast were so disloyal, disparaging and malicious as to be unprotected, and whether all 26 employees who appeared in the broadcast can be held accountable for these remarks. It is true, as General Counsel argues that only four employees spoke in the video and that most of the statements which Respondents

---

[21] *NLRB v. Electrical Workers Local 1229,* 346 U.S. 464 (1953).

[22] Although the court of appeals denied enforcement to the Board's order in *Endicott,* it did so based on its disagreement with the Board regarding the disparaging nature of the statements in the media, not because they were unrelated to a labor dispute. 453 F.3d at 537, fn. 5.

124                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

characterize as false and disparaging were made by Alvarez, the reporter. Three of the four employees quoted, i.e., Fowler, Martinez, and Eriste, made statements indicating that they were instructed to, or encouraged, to lie to customers.[23] Clearly, such statements are highly inflammatory and damaging to Respondents' reputation. Moreover, it is these statements which apparently enticed the TV station to even do a story about Respondents' business. The teaser ad which preceded the news report included an excerpt in which a technician claims he'd been told to lie to customers and the reporter telling the audience "that may be costing you money." The story itself highlighted the technicians claims suggesting they were forced to lie to customers and linked those "lies" to higher costs to the customer. This aspect of the story was clearly inaccurate and misleading. While it is true that it was important to both Respondents that they connect phone lines, such connections cost the average customer nothing. Only in those cases where a customer opted to hide the phone line was there a charge. This was never pointed out in the story.

The evidence also does not support the claims expressed in the story that employees had to lie to customers to avoid being subjected to the $5 charge back. While it is true that employees were subject to this penalty, it would only be applied if they failed to connect at least 50 percent of the receivers they installed.[24] Similarly, although Respondent's supervisors made statements at employee meetings that employees needed to connect the phone lines and had to do whatever was necessary to convince a customer of the benefits of doing so, they were never explicitly told to lie and, certainly, they were provided with other ways of accomplishing this part of their jobs without resort to lying. Yet the comments by the technicians that were broadcast and the statements by Alvarez in the news story made it appear that the employees only recourse was to lie to the customers, "or we can't make money," as Fowler claimed. Even Martinez statement that technicians were told to tell customers that the receiver would blow up if not connected to a phone line, while accurate, was deliberately misleading. I credit Christopher Brown's testimony that he made this statement at a meeting as a joke and did not intend or expect any technician to say that to a customer. The testimony of most of General Counsel's witnesses also makes clear that the employees who heard Brown say this understood he was not being serious. Yet Martinez chose to publicize this comment for no apparent reason other than to harm the reputation of his employer. I also note that Guest admitted that he raised his hand when Alvarez asked which employees had more than $200 in charge backs even though he had not had any. Although Guest testified that he raised his hand because he had more than $200 deducted for other reasons, he clearly was aware when Alvarez asked the question that she was talking about the nonresponder charge-

backs. Guest's willingness to mislead the public in this manner in support of the employees' position in the labor dispute is troubling.

Based on the above, I find that the statements broadcast in the Channel 6 news story were so "disloyal, reckless, and maliciously untrue" as to lose the Act's protection. A review of the broadcast convinces me that the employees' attitude during the broadcast was "flagrantly disloyal, wholly incommensurate with any grievances they had, and manifested by public disparagement of [the Respondents'] product and undermining of their reputation." *Five Star Transportation,* 349 NLRB at 45, quoting from *Veeder-Root Co.,* 237 NLRB 1175, 1177 (1978). The focus of the news report and the employees' comments on apparently fraudulent and deceptive business practices overshadowed the labor dispute that led the employees to seek media support in the first place and were necessarily injurious to Respondents' business. Although only two of employees named in the complaint made disparaging comments in the broadcast (Fowler and Eriste), I find that the others who participated and were shown in the broadcast, are equally culpable. Their appearance lent tacit support to the disloyal, disparaging, and malicious statements made by the technicians who spoke. A reasonable person viewing the broadcast would perceive the employees as being in agreement since no one spoke up to clarify the damaging statements. The employees' mere presence is no different from the conduct of the employees in *Jefferson Standard* who distributed the disloyal handbill that was prepared by someone else, or the employees who did not sign a disparaging letter but authorized another employee to send it. *TNT Logistics North America, Inc.,* 347 NLRB 568 (2006).

Accordingly, based on the above, and the record as a whole, I find that the employees who participated in the Channel 6 news story that was broadcast on May 1 were engaged in activity that was not protected by Section 7 of the Act. Therefore, Respondent DirecTV's attempt to cause their discharge by Respondent MasTec, and Respondent MasTec's discharge of them did not violate the Act.

CONCLUSIONS OF LAW

1. By maintaining a confidentiality policy that interferes with, restrains, and coerces employees in the discussion of their wages, hours, and terms and conditions of employment, and by maintaining an overly broad solicitation and distribution rule that also required employees to obtain permission to engage in protected concerted activity, Respondent MasTec has engaged in unfair labor practices affecting commerce within the meaning of Section 8(a)(1) and Section 2(6) and (7) of the Act.

2. By threatening employees with facility closure and other unspecified reprisals for engaging in protected concerted activity, Respondent MasTec has engaged in unfair labor practices affecting commerce within the meaning of Section 8(a)(1) and Section 2(6) and (7) of the Act.

3. Respondent MasTec did not engage in any other unfair labor practices alleged in the complaint.

4. Respondent DirecTV has not violated the Act in any manner as alleged in the complaint.

---

[23] The fourth employee, Selby, is the one who said the technicians just wanted to be treated fairly. Standing alone, this statement is clearly protected.

[24] While it is not necessary for me to determine the reasonableness of the company policy and the employees' reaction to it, it certainly appears from the evidence in the record that the 50-percent threshold was not impossible to meet, despite the employees excuses.

USCA Case #11-1274      Document #1816471          Filed: 11/19/2019      Page 23 of 23

MASTEC ADVANCED TECHNOLOGIES

REMEDY

Having found that Respondent MasTec has engaged in certain unfair labor practices, I find that it must be ordered to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act. To the extent it has not already done so, Respondent MasTec shall rescind the confidentiality, solicitation, and distribution rules that appeared in the employee handbook in March 2006. Respondent MasTec shall also be ordered to notify all employees who were issued the handbook containing the unlawful rules that the rules have been rescinded and will no longer be enforced. Such notification is to extend to employees at all MasTec facilities who were covered by the unlawful rules. Respondent MasTec shall also be required to post a notice to employees at the Orlando facility involved in this proceeding.

[Recommended Order omitted from publication.]

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 11-1273**                                    **September Term, 2016**
FILED ON: SEPTEMBER 16, 2016

DIRECTV, INC.,
               PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
               RESPONDENT

_____

Consolidated with 11-1274, 11-1294     _____

On Petitions for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board

_____

Before: ROGERS, BROWN and SRINIVASAN, *Circuit Judges*

### J U D G M E N T

      These causes came on to be heard on the petitions for review and cross-application for enforcement of an order of the National Labor Relations Board and were argued by counsel. On consideration thereof, it is

      **ORDERED** and **ADJUDGED** that the petitions for review be denied and the cross-application for enforcement be granted, in accordance with the opinion of the court filed herein this date.

### Per Curiam

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:    /s/

Ken Meadows
Deputy Clerk

Date: September 16, 2016

Opinion for the court filed by Circuit Judge Srinivasan.
Dissenting opinion filed by Circuit Judge Brown.